**Rudolf A. BERNATSCHKE and Cathalene Crane Bernatschke**

v.

**The UNITED STATES.**

No. 236–63.

United States Court of Claims.

July 15, 1966.

---

Willis B. Snell, Washington, D. C., attorney of record, for plaintiff. Lawrence R. Gould, New York City, and J. D. Williams, Washington, D. C., of counsel.

Edna G. Parker, Washington, D. C., with whom was Asst. Atty. Gen. Mitchell Rogovin, for defendant. Richard M. Roberts, Lyle M. Turner and Philip R. Miller, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS and COLLINS, Judges.

---

\* The opinion, findings of fact and recommended conclusion of law are submitted under the order of reference and Rule 57(a).

1. Plaintiff Cathalene Crane Bernatschke's present husband, Rudolf A. Bernatschke,

## OPINION

### PER CURIAM:

This case was referred to Trial Commissioner Herbert N. Maletz with directions to make findings of fact and recommendation for conclusions of law. The commissioner has done so in an opinion and report filed on January 20, 1966. On February 19, 1966, defendant filed a notice of intention to except. However, on June 6, 1966, defendant filed a motion to withdraw notice of intention to except to commissioner's report to which, on June 9, 1966, plaintiffs filed a response stating, among other things, that on the basis of plaintiffs' understanding that the case will be submitted to the court on the commissioner's report if defendant's motion is granted, plaintiffs have no objection to the granting of such motion. The case is thus submitted to the court on the trial commissioner's report filed January 20, 1966, without exception by the parties. Since the court agrees with the trial commissioner's opinion, findings and recommended conclusion of law, as hereinafter set forth, it hereby adopts the same as the basis for its judgment in this case without oral argument. Plaintiffs are, therefore, entitled to recover, together with interest as provided by law and judgment is entered for plaintiffs with the amount of recovery to be determined pursuant to Rule 47(c) (2).

### OPINION OF COMMISSIONER \*

MALETZ, Commissioner:

That is a suit for refund of income taxes and assessed interest thereon paid by plaintiff[1] for the years 1956 through 1959 and 1961, together with statutory interest. The sole issue is whether Section 72 or Section 71(a) (1) of the Internal Revenue Code of 1954 governs the taxability of the sum of $25,000 received each year by plaintiff under certain annuity contracts for which the considera-

is a party to the proceedings because joint returns were filed for the tax years in question. All references hereafter to plaintiff will refer to Cathalene Crane Bernatschke.

tion was paid by her former husband, Cornelius Crane, pursuant to an Agreement of February 20, 1940 incident to a divorce.[2]

In general, annuity payments are taxable under the rules of Section 72 of the Code, with Section 72(b) providing for the exclusion from gross income of a portion of amounts received as an annuity, based on the ratio of the "investment in the contract" to the "expected return." These rules, however, are not applicable to payments under an annuity contract which are includible in the income of the wife under Section 71; such payments are wholly includible in the wife's gross income.[3] Thus, Section 72 of the Code provides in part (26 U.S.C. (1958 ed.) § 72):

> § 72. *Annuities; certain proceeds of endowment and life insurance contracts*
>
> \* \* \* \* \* \*
>
> (b) *Exclusion ratio*—Gross income does not include that part of any amount received as an annuity under an annuity \* \*. \* contract which bears the same ratio to such amount as the investment in the contract \* \* \* bears to the expected return under the contract. \* \* \*
>
> \* \* \* \* \* \*
>
> (k) *Payments in discharge of alimony.—*
>
> (1) *In general.*—This section shall not apply to so much of any payment under an annuity \* \* \* contract (or any interest therein) as is includible in the gross income of the wife under section 71. \* \* \*

Section 71(a) (1) (the portion of Section 71 which is pertinent here) provides (26 U.S.C. (1958 ed.) § 71):

> § 71. *Alimony and separate maintenance payments.*
>
> (a) *General rule.—*
>
> (1) *Decree of divorce or separate maintenance.*—If a wife is divorced or

2. The Agreement recites that plaintiff had instituted a divorce action against Cornelius Crane; that each of the parties was possessed of separate property and estate; that each of the parties was fully appraised of the financial position of the other; that the parties were "desirous of making a complete adjustment and final settlement of all property rights and the respective interests of each of the parties in the properties of the other by virtue of their marital relation, and of releasing to the other all interest in the other's property"; and that Cornelius Crane was desirous of "satisfying and discharging his obligation to pay alimony to \* \* \* [plaintiff]." The Agreement provides that in the event plaintiff was found by the court entitled to a divorce, Cornelius Crane agreed "in lieu of alimony, to deposit with one or more life insurance companies \* \* \* a sum or sums of money sufficient to purchase annuity contracts which shall yield the sum of \* \* \$25,000 per year payable to \* \* \* [plaintiff] during her lifetime, which sum of money is estimated to be approximately \* \* \* \$647,000. \* \* \*" The Agreement states that the annuity contracts were to provide in substance that there was to be no power to revoke the annuities therein provided, nor any power to change the beneficiaries without the consent of both parties; that upon the death of plaintiff, any refund due under the policies was to be divided equally between the daughter of plaintiff (who had been adopted by Cornelius Crane) and Cornelius Crane; and that in the event of the prior decease of Cornelius Crane, any refund was to be distributed to plaintiff's daughter. The Agreement provides that plaintiff agreed to accept the payments "in lieu of all claims of alimony which she may by virtue of said decree have against him." It also provides that Cornelius Crane "does hereby waive, release, quitclaim, relinquish, sell, assign and convey" to plaintiff "all rights of dower, as well as all rights and claims as husband, widower or otherwise" in and to "all property and estate" of plaintiff, "both real, personal and mixed". In addition, plaintiff gave, in the same language, a release and conveyance to Cornelius Crane of "all rights of dower, as well as all rights and claims as wife, widow, or otherwise."

3. The parties have stipulated that if the annuity amount of \$25,000 received by plaintiff is taxable under Section 72 rather than under Section 71, then the sum of \$7,199.05 (rather than \$25,000) was properly includible in her gross income for each of the years in issue.

legally separated from her husband under a decree of divorce or of separate maintenance, the wife's gross income includes periodic payments (whether or not made at regular intervals) received after such decree in discharge of (or attributable to property transferred, in trust or otherwise, in discharge of) a legal obligation which, because of the marital or family relationship, is imposed on or incurred by the husband under the decree or under a written instrument incident to such divorce or separation.

The substance of Section 71 was first enacted in 1942 [4] to allow the husband to deduct "payments in the nature of or in lieu of alimony or an allowance for support" and to tax such payments to the wife who receives them.[5] H.Rep.No. 2333, 77th Cong., 2d Sess., p. 71 (1942). See also S.Rep.No.1631, 77th Cong., 2d Sess., p. 83 (1942) ; 5 Mertens, Law of Federal Income Taxation, § 31A.01, pp. 1–2. In conformity with this legislative purpose, Section 7.71–1 of the Treasury Regulations on Income Tax (1954) specifies that "Section 71 provides rules for treatment in certain cases of payments in the nature of or in lieu of alimony or an allowance for support as between spouses who are divorced or separated. * * * " In addition, Section 7.71–1 (b) (4) of the Regulations states that "Section 71(a) applies only to payments made because of the family or marital relationship in recognition of the general obligation to support which is made specific by the decree, instrument, or agreement * * * " See also e. g. H.Rep.No. 2333, 77th Cong., 2d Sess., p. 72 (1942).

Against this background, plaintiff contends that all or part of the cost of the annuity contracts was paid by Cornelius Crane for reasons other than his obligation to support plaintiff and hence that the annual payments of $25,000 received pursuant to the contracts were taxable in whole or in part under the rules set forth in Section 72 of the Code. Defendant argues, on the other hand, that the annual payments of $25,000 received by plaintiff constituted periodic payments in discharge of a legal obligation incurred by her former husband because of the marital or family relationship, and not in settlement of any property rights, and thus were wholly includible in her gross income under Section 71(a) (1) of the Code.

■■ The nub of the problem is thus to determine whether or not plaintiff's former husband, Cornelius Crane, paid the consideration for the annuities by virtue of an obligation to support plaintiff which was imposed on him by their marital relationship. This is a question that depends upon the substance of the transaction and the true intent of the parties, rather than on the labels or formal provisions of the written contract or divorce decree. Taylor v. Campbell, 335 F.2d 841, 845 (5th Cir. 1964) ; Bardwell v. Commissioner of Internal Revenue, 318 F.2d 786, 789 (10th Cir. 1963) ; Soltermann v. United States, 272 F.2d 387, 390 (9th Cir. 1959) ; Landa v. Commissioner of Internal Revenue, 93 U.S.App. D.C. 265, 211 F.2d 46, 50 (1954) ; Ann Hairston Ryker, 33 TC 924, 929 (1960) ; Julian Nathan, 19 TC 865, 872 (1953). Parol evidence may be considered in mak-

4. The provision was enacted as a portion of Section 22(k) of the Internal Revenue Code of 1939, by Section 120(a) of the Revenue Act of 1942, 56 Stat. 816. When the Internal Revenue Code of 1954 was enacted, the language of Section 22(k) was "restated for purposes of clarity", but no substantive change was made. H.Rep. No. 1337, 83d Cong., 2d Sess., pp. A–20—A–21 (1954). See also S.Rep. No. 1662, 83d Cong., 2d Sess., p. 170 (1954), U.S.Code Cong. & Admin.News 1954, p. 4017.

5. Though the 1942 Act was adopted some two years after plaintiff's divorce from Cornelius Crane, the Act made these provisions applicable, in general, to amounts received in taxable years beginning after December 31, 1941, regardless of the date of the divorce or written instrument. See Section 120(g) of the Revenue Act of 1942, 56 Stat. 818; Mahana v. United States, 88 F.Supp. 285, 115 Ct.Cl. 716 (1950), cert. den. 339 U.S. 978, 70 S.Ct. 1023, 94 L.Ed. 1383 (1950).

ing this determination, particularly since the Agreement here is ambiguous at best, failing, for example, to afford any indication as to how or why the parties determined either the amount which Cornelius Crane would pay or the provisions applicable to the annuities to be purchased. Taylor v. Campbell, supra; Bardwell v. Commissioner of Internal Revenue, supra; Landa v. Commissioner of Internal Revenue, supra and 92 U.S. App.D.C. 196, 206 F.2d 431, 432 (1953); Scofield v. Greer, 185 F.2d 551, 552 (5th Cir. 1950). We therefore turn to the facts of the present case as established by the testimony in the record.

Plaintiff, who was born in 1906, is a housewife and has never been gainfully employed. Her father was a naval medical officer who came from a family of well-to-do professional people; her mother also had considerable means in her own right due largely to her skill as an investor. In 1922 plaintiff was married to a naval flyer but the marriage ended in divorce some seven years later. They had one child, a daughter.

In 1929 plaintiff married Cornelius Crane (hereafter referred to as "Cornelius"), the grandson of the founder of the Crane Company (a manufacturer of plumbing equipment and valves) and the only son of R. T. Crane, Jr., the president and controlling stockholder of that company. The Crane family was possessed of great wealth and its members —including Cornelius and plaintiff— lived on a lavish scale in family mansions in Chicago (their primary residence), Massachusetts and Georgia, and a family apartment at the Ritz in New York. Cornelius, who himself possessed substantial wealth through gifts and inheritance, and also received income from trusts established by his father, was not interested in the family business and at no time in his life held a position for which he received a salary. As a young man he decided he did not want to go to college, but would like to go around the world on a yacht and explore parts of the world which others had not reached. Accordingly, his father bought him a sailing ship which was about 140 feet in length and carried a crew of 26. From this trip he developed an interest in archeology and anthropology, and financed and conducted several expeditions in his vessel to the South Seas. His other interests consisted of hunting, fishing, walking through the woods and reading.

Cornelius' personal budget (as well as that of the entire Crane family) was managed by J. K. Prentice, who had been his father's private secretary, who served as a confidant to the entire family and who stood in place of a father to Cornelius after R. T. Crane, Jr. died. Cornelius had a different attitude toward money than most people. For example, very early in his marriage to plaintiff he became "sick" of Bermuda and suddenly sold for the extraordinarily low price of $25,000 a 26-acre island he owned at the entrance to the harbor in Bermuda, together with a restored house thereon and four boats. He purchased property in Tahiti without ever having seen it. Withal, Cornelius and plaintiff were more alike than different in various respects. Neither had ever been gainfully employed. While Cornelius occupied himself with his interests in archeology and anthropology, plaintiff occupied herself with giving singing concerts (which were artistic successes rather than profitable ventures) and with charitable endeavors. Both were unconcerned with, and uninterested in, finances and property. Thus, until her marriage to Cornelius, plaintiff relied on her mother completely to manage stocks and bonds which her mother and grandmother had given her; after the marriage she turned her investments over to the Crane family to manage. During her marriage to Cornelius, her stock and bond holdings were augmented by gifts from Cornelius and his father, and as of February 1940 had a market value of about $347,000, which produced a yield of about $13,000 in that year.

Throughout his marriage to plaintiff, Cornelius continued his sailing expeditions and was away for extended periods

of time; plaintiff did not accompany him on these trips. After February 1936, Cornelius and plaintiff did not live together as man and wife, although he continued to support her and her daughter by her first marriage. By 1939, plaintiff was considering getting a divorce and retained an attorney, but did not pursue the matter further at that time. In the latter part of that year, Cornelius adopted plaintiff's daughter, the adoption being prompted at least in part by his desire to effect a reconciliation with plaintiff. (Plaintiff and Cornelius had no children of their own.) Thereafter, upon the happening of some incident, plaintiff finally reached a firm decision to go ahead with the divorce and filed a divorce action in the Circuit Court of Cook County, Illinois, on February 19, 1940. The divorce was granted on the ground of desertion on February 23, 1940. Up to the final day of the divorce, Cornelius tried to dissuade plaintiff from going through with it. Plaintiff and Cornelius remained friendly at all times during, before and after the divorce proceedings.

At the time that she finally decided to proceed with the divorce, plaintiff's attorney indicated to her that she had a dower right and that such right was a third of an estate. Plaintiff told her attorney that she wanted a lump-sum settlement and asked him to find out from Cornelius what would be fair. She felt that having been a good wife something was due her and she wanted any settlement in a lump sum so that she would never again have to go back to Cornelius and ask for anything—for household money and things like that in the future; she wanted all ties cut.

Meanwhile, Cornelius discussed the matter with his advisers and stated that he would be willing to make a reasonable property settlement, based on his assets, to take care of plaintiff and that he wanted to be, if anything, liberal in the amount of such settlement. He requested one of his advisers to ascertain the amount of income-producing assets he had under his control and it was determined that they were worth about $2,-000,000. Cornelius thereupon indicated to his attorney that if he died without a will, plaintiff would get one-third of that amount. The attorney said that that would probably be right by virtue of her dower rights.[6] Cornelius then stated to his advisers that he and plaintiff had been married for ten years; that he thought he should make a property settlement which substantially represented her dower rights in his assets; and that he would give her $650,000, approximately one-third of his assets of $2,000,000. After having so decided (and also determining what he would give to plaintiff's daughter whom he had adopted), he told his advisers to work out the details.

J. K. Prentice (who, as previously indicated, managed Cornelius' personal budget) approved of Cornelius' decision to make a liberal settlement for plaintiff, but opposed turning over liquid assets to her since he was afraid she might give them away or that someone might take them from her. Consequently, he felt strongly that the sum to be paid should be so invested that she could not dissipate her principal, and he urged that annuities be used for that purpose. He mentioned the subject to plaintiff; she respected and trusted Prentice and when he recommended annuities to her, she accepted this recommendation and asked Cornelius to take care of buying the annuities for her, insisting, however, that Cornelius be given a contingent right to receive refunds under the annuity contracts in the event of her death. The actual arrangements for the purchase of

---

6. Under Chapter 3, Section 11 of the Illinois Code, effective January 1, 1940 (Ill. Rev.Stat.1941, Ch. 3, § 162), the surviving spouse of a resident intestate decedent was entitled to one-third of his real and personal property when there was also a surviving descendant of the decedent; under Chapter 3, Section 14, a lawfully adopted child was deemed a descendant for this purpose (Ill.Rev.Stat.1941, Ch. 3, § 165).

annuities were handled by Cornelius' advisers who made inquiries of insurance companies to ascertain how much of an annuity for a person of plaintiff's age and description could be bought for $650,000 and were informed by such insurance companies that approximately $647,000 would buy an exact or round amount of $25,000 per year. The amount of the income to be paid was the result of the determination of the approximate amount of the principal to be paid, not the cause of such amount.

In the discussions Cornelius had with his advisers there was no mention of alimony; Cornelius simply determined that he would give plaintiff part of his assets. Nor did anyone at any time mention alimony in the discussions in which plaintiff participated with her attorney, Cornelius or any of his advisers. During the course of the negotiations, Cornelius told her she would receive a lump sum and plaintiff understood that she would get a "one-time payment."

At the time of the divorce, plaintiff did not transfer any of her property to Cornelius, except for such items as primitive artifacts that had no great intrinsic value. Nor, with the exception of some household items, did Cornelius transfer any property to plaintiff at the time of the divorce other than the amount provided in the Agreement of February 20, 1940.

Following the divorce, plaintiff in March 1940 married her present husband, a portrait painter, who has been successful artistically though not financially.

Subsequently, in accordance with the Agreement of February 20, 1940, plaintiff (and her present husband) granted to Cornelius quitclaim deeds and released to him all rights in property Cornelius owned in Massachusetts and Tahiti. Cornelius fulfilled his obligations under the Agreement by liquidating a substan-

tial portion of his income-producing assets and having one of his advisers in the months following the divorce purchase 13 annuity policies from various insurance companies to provide total annual payments of $25,000 to plaintiff.

Plaintiff's standard of living changed markedly after her divorce from Cornelius since she could no longer live in the kind of lavish luxury produced by the Crane family's great wealth. In the tax years here involved, plaintiff has received dividend and interest income from her stocks and bonds (which are now worth about $1,000,000) of from $23,-000 to $30,000 a year, which income is over and above the $25,000 each year received under the annuity contracts. The 25,000 annuity is commingled with her dividend income and is used for normal living expenses, taxes, investments, savings, etc.

In summary, the record shows that at no time during the negotiation of the Agreement of February 20, 1940 was there any mention of alimony. Plaintiff did not request it and Cornelius did not mention it. Nor was there any attempt to determine the extent or the dollar value of Cornelius' obligation to support plaintiff or to pay alimony. The record shows, rather, that the amount which plaintiff received pursuant to the Agreement was derived solely on the basis of the income-producing property then owned outright by Cornelius and what the parties understood to be plaintiff's intestate share in his estate or "dower" rights; and that such amount was determined without reference to any obligation to support or pay alimony. Thus, it seems evident that the amounts paid by Cornelius for the annuity contracts were not based on the marital obligation to support and were not intended to be payments in discharge of such an obligation but rather were intended to be in the nature of a property settlement [7] un-

7. It is not necessary that there be an exact, mathematical division of property in order for a divorce agreement to constitute a property settlement. In Scott

v. United States, 225 F.Supp. 257 (D. Oreg.1963), it was held that payments received by the wife were pursuant to a property settlement and not taxable un-

der which plaintiff's inchoate interests in Cornelius' property under Illinois law were extinguished.[8]

In addition to these considerations, other factors present here provide further indication that the annuity payments to plaintiff do not have the usual characteristics of alimony or support.[9] See generally 5 Mertens, Law of Federal Income Taxation, § 31A.02, pp. 20–1. First, the fact that the payments were to continue for the lifetime of the plaintiff, without regard to her remarriage or the death of her ex-husband, tends to show that they were not intended as alimony or in discharge of a marital obligation to support. Soltermann v. United States, 272 F.2d 387, 390 (9th Cir. 1959); Campbell v. Lake, 220 F.2d 341, 343 (5th Cir. 1955); Scofield v. Greer, 185 F.2d 551, 552 (5th Cir. 1950). See also Anno. 39 A.L.R.2d 1406 (1955); 48 A.L.R.2d 270 (1956). Cf. Ada M. Dixon, 44 TC 709, 713 (1965). It is relevant, also, that plaintiff received and exercised the right to determine the beneficiary of refunds that might be payable after her death. It would appear that if the annuity payments had been intended as support payments for plaintiff, Cornelius, rather than plaintiff, would have retained and exercised the power to determine the recipient of any part of the sum not needed for that purpose.

In addition, it is customary for support payments to be related to the husband's income and, frequently, to vary if there is a substantial change in such income. See Ann Hairston Ryker, 33 TC 924, 929 (1960); Brown v. United States, 121 F.Supp. 106, 107 (N.D.Cal.

1954). The wife is ordinarily entitled to be supported in the same style of living to which she was accustomed during the marriage. See e. g., Walters v. Walters, 341 Ill.App. 561, 94 N.E.2d 726 (1950), aff'd 409 Ill. 298, 99 N.E.2d 342 (1951); Herrick v. Herrick, 319 Ill. 146, 151, 149 N.E. 820, 823 (1925). The amount of the wife's own income is, obviously, also a factor in determining her need for support. Here the payments were not related in any way to Cornelius' substantial income. The parties agreed on a lump sum based entirely on assets which he owned outright, without reference to the trust income he received, and then fixed the amount of the annual payments on the basis of what annuities the lump sum would buy. There could be no variation, of course, because of changes in Cornelius' income (or because of any property which he might later inherit). Nor was plaintiff's income considered in any way as a factor in determining the amount to be paid. Furthermore, the amount of the annuity payments, even when combined with plaintiff's income from her stocks and bonds, could not possibly allow her to live in a style which would in any way approach that to which she had been accustomed as Cornelius' wife, and the record in fact shows that her standard of living changed markedly after the divorce.

Another factor of significance is whether or not there is a fixed sum the husband is required to pay; the absence of such a fixed sum is considered to indicate that support was intended. Taylor v. Campbell, 335 F.2d 841, 845 (5th Cir. 1964); Bardwell v. Commissioner of Internal Revenue, 318 F.2d 786, 789 (10th

der Section 71, even though neither the wife nor the husband knew what property stood in their individual names and what property stood in their joint names.

8. Even under the somewhat unusual facts of the present case, it would be unrealistic to regard the transaction here as a gift. "Property transferred pursuant to a negotiated settlement in return for the release of admittedly valuable [inchoate marital] rights is not a gift in any sense of the term." United States v. Davis, 370 U.S.

65, 69, fn. 6, 82 S.Ct. 1190, 1192, 8 L.Ed.2d 335 (1962).

9. The concept of "alimony" and "support" under Section 71 is not governed by "the laws of different States concerning the existence and continuance of an obligation to pay alimony." H.Rep. 2333, 77th Cong., 2d Sess., p. 72 (1942). See also e. g., Taylor v. Campbell, 335 F.2d 841, 845–846 (5th Cir. 1964); Bardwell v. Commissioner of Internal Revenue, 318 F.2d 786, 789 (10th Cir. 1963).

Cir. 1963); Campbell v. Lake, 220 F.2d 341, 343 (5th Cir. 1955); Ann Hairston Ryker, 33 TC 924, 929 (1960). Here the contract itself specifically provides the amount which the husband was required to pay and the record shows that the settlement was determined on the basis of his paying such amount.

█ In conclusion, the record establishes that Cornelius Crane did not pay the consideration for the annuity contracts because of any marital obligation to support plaintiff and, accordingly, the annuity payments are not taxable under Section 71.[10] Plaintiffs are entitled to a refund of income tax for the years involved based on the application of the rules of Section 72 to the annuity payments received in each year.

10. In view of this conclusion, it is unnecessary to pass upon plaintiff's alternative contention that she in substance purchased the annuities with her own money, with Cornelius acting, in effect, as her agent for that purpose.