ANNE S. LASTER, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT
GEORGE A. BURWELL AND JEANNE F. BURWELL, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 858-65, 884-66. Filed May 16, 1967.

---

*Stuart R. Hays*, for the petitioner in docket No. 858–65.
*John W. Tissue*, for the respondent.

HOYT, *Judge:* Respondent determined deficiencies in income taxes against petitioners in these consolidated cases as follows:

| Taxpayer | Year | Amount |
|---|---|---|
| Anne S. Laster | 1960 | $265.24 |
| Anne S. Laster | 1961 | 265.19 |
| George A. Burwell and Jeanne F. Burwell | 1961 | 349.80 |
| George A. Burwell and Jeanne F. Burwell | 1962 | 361.75 |

The principal issues to be decided are whether or not payments made periodically by George A. Burwell to Anne S. Laster, his former wife, are includable in her gross taxable income and are nondeductible personal expenditures by him. In the alternative respondent contends that the payments constitute alimony to Anne taxable under section 71(a)(2) and are deductible by George under section 215 of the Internal Revenue Code of 1954.[1]

### FINDINGS OF FACT

These cases have been consolidated for trial, briefing, and opinion. Some of the facts have been stipulated and such facts, together with the stipulated exhibits, are incorporated herein by this reference. A recital of some of the facts necessary to our conclusions and a decision of the issues herein follow.

Petitioner in docket No. 858–65 is Anne S. Laster, who resides in Norfolk, Va. She filed Federal income tax returns for the years 1960 and 1961 with the district director of internal revenue at Richmond, Va.

---

[1] Unless otherwise noted, all statutory references shall be to the Internal Revenue Code of 1954.

Petitioners in docket No. 884–66 are George A. and Jeanne F. Burwell, husband and wife. They resided at the U.S. Naval Station, San Juan, Puerto Rico, where George was serving as a naval officer on active duty. Jeanne F. Burwell is a petitioner herein solely by reason of having filed joint returns with her husband for the years 1961 and 1962, these returns also being filed with the district director at Richmond. All references hereinafter made to petitioners in docket No. 884–66 shall be in the singular and shall refer solely to George Burwell. References hereinafter made to petitioners shall refer to Anne and George.

On February 1, 1958, Anne Laster, widow of the late Conley Clark Laster, Jr., commander, USN, married George A. Burwell, captain, USNR, at Norfolk, Va. At that time George held the rank of commander, USNR.

Prior to her marriage to George, Anne had been a widow for approximately 7 years. Laster died in 1951 and after his death Anne became entitled to receive the sum of $133.40 per month from the Veterans' Administration as survivorship benefits. These payments were to continue until Anne's remarriage or death, whichever should first occur. As a consequence of Anne's marriage to George in February of 1958, the Veterans' Administration ceased to make the monthly survivorship payments to her. Anne was the mother of children by her prior marriage, and George had also been married previously and was the father of several children by that marriage.[2]

After Anne and George had been married for approximately half a year, it became clear to them that the marriage was not going to succeed. The primary reason for the failure of the marriage was the hostility harbored by both sets of children toward the offspring of their new stepparent; additionally, the parties to the marriage themselves entertained similar sentiments with respect to each other's children. At any rate, by August of 1958, both parties realized that the marriage had failed and would have to be terminated. George asked Anne to leave stating that his children could not abide hers, nor could he; George's children likewise told Anne that they wanted her and her children to leave. Anne decided that she did not "want any part of him [George] or his children" and that they were the cause of the marital breakup. She so informed George and on or about August 15, 1958, Anne and George separated; they have not lived together since that time.

George was to leave the Norfolk area for a new duty station in Spain during the month of September. Before departing he advised

---

[2] The record does not disclose the ages or exact number of the children of the respective petitioners nor does it disclose the circumstances under which George's prior marriage ended. However, Anne's testimony at trial reveals that the children of both prior marriages resided with Anne and George at Norfolk in 1958. Apparently Anne had at least two children and George had at least three.

Anne that he wished to provide for her at least to the extent of providing amounts equal to the prior Veterans' Administration payments she had lost upon her remarriage. Anne's lawyer negotiated with George about an agreement. On August 27, 1958, prior to his scheduled departure, Anne and George entered into a separation agreement which obligated him to pay her certain monthly sums. The monthly payments called for were exactly equal to the monthly benefits which Anne had given up by her marriage to George, $133.40. These monthly payments were to continue for a period of 10 years or until Anne's remarriage. The agreement between George and Anne provided in pertinent part as follows:

THIS AGREEMENT, Made in triplicate this the 27th day of August, 1958, by and between GEORGE A. BURWELL, party of the first part, and ANNE STEWART BURWELL, party of the second part.

### WITNESSETH

THAT WHEREAS differences have arisen between the parties hereto, on account of which they have separated and now live apart, and intend to live apart from each other for the rest of their natural life;

Now THEREFORE, in settlement, adjustment and compromise of all property rights and in consideration of the mutual promises and covenants hereinafter set forth, the parties hereto have agreed as follows:

(1) The party of the first part shall pay unto the party of the second part the sum of $133.40 per month, payable in advance, on the first of each month, which sum shall be payable for a period of ten (10) years or until the said ANNE STEWART BURWELL shall remarry, whichever shall be the sooner.

   \*      \*      \*      \*      \*      \*      \*

(3) It is mutually agreed and understood between the parties hereto that each shall be free to sell or otherwise dispose of his or her own property by gift deed or Will without anywise encumbering the rights of the other (subject to the provisions of this agreement) and each party is hereby barred from any and all rights or claims by way of dower, courtesy, [sic] descent, inheritance, distribution or in any other way arising out of the property and each party hereto releases unto the other and to their heirs, executors, administrators and assigns thereof all claims or rights of dower, courtesy [sic] or inheritance in and to all real estate of the other whether now held or thereafter acquired and each party releases the other from all rights of support, alimony and maintenance except as herein stipulated.

   \*      \*      \*      \*      \*      \*      \*

(5) It is understood and agreed by and between the parties hereto that should either party maintain an action for divorce against the other that this agreement shall become and be a part of any decree which may be entered therein.

IN WITNESS WHEREOF, the parties hereto have hereunto set their hands and seals, the day, month and year first hereinabove written:

                        (S)  George A. Burwell    [SEAL]
                              GEORGE A. BURWELL

                        (S)  Anne Stewart Burwell  [SEAL]
                              ANNE STEWART BURWELL

Anne owned only a moderate amount of income-producing property; before her marriage to George she had lived at home with her mother but in August of 1958 when her new marriage failed she decided to live in a place of her own. It is obvious that these payments to her by George would necessarily constitute an important source of revenue with which to support herself and those of her children living with her.[3]

At first Anne was not inclined to accept these payments from George, not wanting anything from him whatever. She returned a wedding band and engagement ring along with other property which George had given her and informed him that she did not "want one thing you have." However, after consultations with her family and her lawyer, she was persuaded that it would be wise to accept the suggested monthly payments. Accordingly, she signed the separation agreement with George dated August 27, 1958. No property of consequence was acquired by either party to the marriage during the few months they lived together. In September, George departed as planned for his new post in Spain.

Subsequent to the events described above surrounding the breakup of the marriage in August of 1958, Anne, as anticipated, commenced an action for divorce in the Court of Law and Chancery of the City of Norfolk. As grounds for divorce Anne alleged and charged in her complaint that George had deserted her. We do not know exactly what was specified in the complaint nor do we know exactly when it was filed, but apparently it was soon after the separation occurred. George began making payments pursuant to his obligation under the agreement on September 1, 1958, and continued thereafter to perform in good faith.

On January 26, 1959, following further consultation with her attorney, Anne amended her pleadings in the divorce proceeding and prayed that an annulment be granted instead of a divorce. It appears that one of the motives for amending the pleadings was that a decree of annulment (as opposed to a decree of divorce) might prove helpful to Anne in securing a restoration of her Veterans' Administration benefits as Laster's widow. Apparently the ground for annulment, George's impotency at the time of the marriage, was an afterthought. It was not referred to or mentioned at the time of the marital breakup nor was it even suggested by Anne in her testimony as a cause for the separation which led to the separation agreement of August 27, 1958. Indeed her testimony never even hinted that George's impotency or alleged fraud with respect thereto was a subject of discussion between

[3] During the taxable years 1960 and 1961, for example, Anne's gross income, exclusive of the payments in issue, did not exceed $2,600. In 1958 her gross income was apparently only $720, interest from building and loan savings.

the petitioners or a contributing cause to the breakup of the marriage and the separation in August of 1958.

According to Anne it was all due to unpleasantness and friction among the children and between George and Anne's children and Anne and his. In her words: "I was more or less asked to leave. * * * I didn't want any part of him or his children. They were the cause of the separation. I told him that then. * * * He asked me to leave because his children just couldn't stand mine and neither could he, and his children told me they would rather we leave, so I did." It was not until some months later that Anne's complaint for divorce was amended to allege George's fraud or seek an annulment of the marriage. Meanwhile George had made the monthly payments to Anne pursuant to the August 27 agreement and he continued to do so.

In any event, on May 18, 1959, the Court of Law and Chancery of the City of Norfolk entered the following decree of annulment:

VIRGINIA:

In the Court of Law and Chancery of the City of Norfolk, on the 18th day of May, 1959.

ANNE STEWART BURWELL, Plaintiff

*v.*

GEORGE A. BURWELL, Defendant

DECREE

This cause came on this day to be heard upon the bill of complaint and the appearance and answer of the defendant and the exhibits filed herein, and upon the depositions of witnesses taken in support of the allegations in complainant's bill and upon the report and recommendations of the Commissioner in Chancery before whom the evidence was heard, and upon argument by counsel; and it appearing from the testimony herein independently of the admissions of either party in the pleadings or otherwise that the parties to this cause are members of the white race, that they were married on February 1st, 1958, in the City of Norfolk, Virginia, that they last resided together in the City of Norfolk, Virginia, on the 15th day of August, 1958, that the defendant was impotent at the time of his marriage to the complainant and incapable of consummating the marriage which fact was unknown to the complainant until the marriage and which fact was fraudently [sic] concealed from the complainant; that there were no children born of this marriage; that the complainant is a bona fide resident of and domiciled in the City of Norfolk, and State of Virginia, and has been for more than one year next preceding the commencement of this suit; that the Commissioner who heard the evidence in this cause recommends the entry of a decree annulling the said marriage.

UPON CONSIDERATION WHEREOF, the Court doth ADJUDGE, ORDER and DECREE that it has jurisdiction of the parties and the subject matter of this suit, and that the marriage between Anne Stewart Burwell and George A. Burwell be and the same is hereby annulled and set aside; and it appearing to the Court that the Complainant, Anne Stewart Burwell, desires to resume her former name Anne Stewart Lassiter; [sic]

It is ADJUDGED, ORDERED and DECREED that the complainant be restored to her former name of Anne Stewart Laster.

A copy teste: W. L. PRIEUR, JR., *Clerk*

By: (S) H. L. STOVALL, *Deputy Clerk*

The provisions of the separation and support agreement of August 27, 1958, were not mentioned by nor incorporated into the decree. The agreement itself specifically provided for such incorporation, "should either party maintain an action for *divorce* against the other." All payments made by George to Anne, both before and after the decree of annulment was entered, were made pursuant to his obligation under the agreement of August 27, 1958, as later amended by mutual consent of the parties.

After the marriage was annulled, George continued to make the monthly payments which the agreement called for. On or about January 1, 1960, Anne began to receive $26.10 per month from the Social Security Administration.[4] In accordance with her desire not to be beholden to George, Anne returned $52.20 to George in 1960 and agreed that her monthly payments from him should be reduced by $26.10, the amount of the monthly social security benefits. The $52.20 which Anne voluntarily returned to George in 1960 represented the social security benefits received by her for January and February of 1960, in each of which months George had paid her $133.40.

Thereafter, and in all taxable years before us George continued to make payments to Anne in the reduced amount of $107.30 per month. The net amount of these payments during each of the years 1960, 1961, and 1962 was $1,287.60. At a date subsequent to these years, sometime in the year 1964, Anne secured complete restoration of her Veterans' Administration benefits and released George from his support obligations under their 1958 separation agreement, as amended.

Anne did not report any of the monthly payments received from George in her Federal income tax returns for 1960 and 1961. Respondent determined that in each of these years the amounts received from George were includable in her gross taxable income. Accordingly, respondent adjusted Anne's gross income to reflect the payment to her of $1,287.60 in both years. This adjustment necessitated a concomitant decrease in her medical expense deductions by 3 percent of $1,287.60, her adjusted gross income having been increased by this amount. If respondent is upheld in his determination that the payments from George constitute gross income to Anne, then the purely mathematical adjustments to her medical deductions, which are not otherwise in

---

[4] The record is not clear as to whether or not this amount was a part of the former widow's benefits Anne had previously enjoyed. Apparently the social security payments and the Veterans' Administration payments had together made up the total of $133.40 per month in survivorship benefits paid by the Veterans' Administration before Anne married George. In any event an exact determination about that is not necessary here.

issue, will have been proper. After making the adjustments to Anne's income mentioned above, respondent determined deficiencies in her income tax of $265.24 for 1960 and $265.19 for 1961.

In his returns for the years 1961 and 1962, George deducted the amounts he had paid to Anne pursuant to the 1958 agreement. His returns claimed such payments as "Periodic support payments to ex-wife, Anne S. Laster of Norfolk, Virginia." In 1961 he claimed $1,200 and in 1962 he claimed $1,287.60. In the 1962 return he stated that whereas his 1961 return showed only $1,200, the correct amount was $1,287.60, $107.30 monthly. The parties have stipulated that he paid Anne $1,287.60 in each year. Respondent disallowed the deductions upon the ground that the payments were not "alimony or separate maintenance" within the purview of sections 215 and 71, I.R.C. 1954, or deductible under any other Code section. He determined deficiencies of $349.80 for 1961 and $361.75 for 1962 against George.

OPINION

Respondent and Anne argue, on much the same grounds, that the payments made to Anne by George, pursuant to the 1958 separation agreement, do not fall within the ambit of section 71(a)(2), and, hence, cannot be taxed to her and deducted by him under section 215. Respondent argues further, however, that although not taxable to Anne under the specific provisions of section 71, the payments constitute gross income to her under the general principles of section 61. Anne, for her part, urges that the payments are not gross income to her because they are in the nature of damages or recoupment for the fraud which was perpetrated upon her by George. See the annulment decree, *supra*, and the grounds for annulment stated therein.[5] On the evidence before us we can only conclude and hold that the monthly payments under the separation agreement were for Anne's support and maintenance for a term of years or until her remarriage and not at all for damages for fraud, at that time not alleged or even discussed. At most they were measured by the yardstick of the Veterans' Administration payments she lost when she married George. The evidence is totally inadequate to establish that in substance they were anything other than what they appear to be in form—periodic support payments pursuant to a written separation agreement because of the marital or family relationship.

---

[5] We must note that George was the father of several children by a prior marriage. See our findings of fact, *supra*. We have no evidence whatever before us to determine the presence or absence of his impotency or his fraud with respect thereto. All that we know is that some time after the parting of the ways and after the separation agreement was signed in August, Anne alleged such grounds for an annulment in her previously filed suit for divorce. On the evidence before it, the Norfolk court found fraud and granted Anne's petition.

We cannot agree with respondent's sometimes confused and general arguments that the payments were designed and calculated to compensate Anne for loss of income because of George's fraud and hence are taxable income to her and at the same time personal to George and hence nondeductible by him. We conclude that they were not so intended nor were they paid for any such purpose. The evidence clearly establishes to our satisfaction that the payments by George are within the purview of section 71(a)(2).[6] Accordingly, they constitute gross income to Anne under that section and are deductible by George under section 215.[7]

The primary and most persuasive reason advanced by Anne and respondent as to why the payments are not within the scope of section 71(a)(2) is that they, as a matter of law, could not conceivably have been because "of the marital or family relationship," in view of the subsequent annulment, which determined that the marriage was void *ab initio* under Virginia law. All parties appear to agree that if the payments were "because of the marital or family relationship," then there is no reason why they should not qualify for section 71(a)(2) treatment.

Respondent's position (which is the same as Anne's insofar as sec. 71 is involved) is grounded upon an overly technical interpretation of the applicable law. The highly attenuated argument which Anne and respondent would have us accept is that because the marriage would be considered never to have existed under Virginia law, no marital or family relationship could have existed for purposes of section 71(a)(2). While this argument at first blush appears to have some merit, we do not find it persuasive after considering the body of law, grounded on section 71 and its predecessor, which has matured since 1942. Furthermore, respondent and Anne give too little weight to the

---

[6] Sec. 71(a)(2), I.R.C. 1954, deals with payments made pursuant to a written separation agreement and provides as follows:

SEC. 71. ALIMONY AND SEPARATE MAINTENANCE PAYMENTS.

(a) GENERAL RULE.—

\* \* \* \* \* \* \*

(2) WRITTEN SEPARATION AGREEMENT.—If a wife is separated from her husband and there is a written separation agreement executed after the date of the enactment of this title, the wife's gross income includes periodic payments (whether or not made at regular intervals) received after such agreement is executed which are made under such agreement and because of the marital or family relationship (or which are attributable to property transferred, in trust or otherwise, under such agreement and because of such relationship). This paragraph shall not apply if the husband and wife make a single return jointly.

[7] Sec. 215, I.R.C. 1954, provides as follows:

SEC. 215. ALIMONY, ETC., PAYMENTS.

(a) GENERAL RULE.—In the case of a husband described in section 71, there shall be allowed as a deduction amounts includible under section 71 in the gross income of his wife, payment of which is made within the husband's taxable year. No deduction shall be allowed under the preceding sentence with respect to any payment if, by reason of section 71(d) or 682, the amount thereof is not includible in the husband's gross income.

(b) CROSS REFERENCE.—

For definitions of "husband" and "wife", see section 7701(a)(17).

Virginia law relating to domestic relations and the dissolution of marriage.

Although several Virginia cases speak of annulled marriages as being absolutely void depending upon the grounds for annulment, it is clear that Virginia courts would not regard even a null and void marriage as beyond the pale of imposing a continuing support obligation upon the husband in certain circumstances. *Henderson* v. *Henderson*, 187 Va. 121, 46 S.E. 2d 10 (1948).

In *Henderson* the Supreme Court of Appeals thus interpreted the general Virginia statutory provision which authorizes a court dissolving a marriage to award alimony, maintenance, custody, child support payments, etc. Section 20-107, Va. Code Ann. (1960), is the current statute and it provides as follows:

Sec. 20-107. Court may decree as to estate and maintenance of parties, and custody of children.—Upon decreeing the dissolution of a marriage, and also upon decreeing a divorce, whether from the bond of matrimony or from bed and board, and upon decreeing that neither party is entitled to a divorce the court may make such further decree as it shall deem expedient concerning the estate and the maintenance of the parties, or either of them, and the care, custody and maintenance of their minor children, and may determine with which of the parents the children or any of them shall remain, provided, that the court shall have no authority to decree support of children or alimony to continue after the death of the father or husband. * * *

The court in *Henderson* was actually dealing with the predecessor statute, section 5111, Va. Code Ann. (1942), which, so far as it concerns us, is substantially the same as the current provision. See *Henderson* v. *Henderson* at 127, 46 S.E. 2d at 13, for the exact wording of the prior statute. At issue in *Henderson* was whether a trial court, in decreeing a marriage to be null and void because one of the parties was incapable of contracting a valid marriage, had jurisdiction under the statutory provision to enter a further decree concerning the custody, maintenance, and support of an infant child born to the parties. In holding that the trial court was so empowered, the Supreme Court of Appeals explicitly decided that section 5111, Va. Code Ann. (1942), applied in toto to decrees of annulment, as well as to divorces and other decrees dissolving marriages. Id. at 127-128, 46 S.E. 2d at 13.

Evidently the legislature in enacting section 5111 did not intend to make any distinction between decrees for the dissolution of a marriage and decrees annulling a marriage. * * * The intent was to authorize a court to make such further decree as it might deem expedient in cases pending before it dealing with *the severance of the relations of the parties incident to marriage.* [Ibid. Emphasis added.]

We have held under the prior Internal Revenue Code that where, under local law, an annulment can have the same effect as a divorce for purposes of support, payments made pursuant to a support agree-

ment incident to a decree of annulment are treated as alimony taxable to the recipient. See *Lily R. Reighley*, 17 T.C. 344 (1951), which involved section 22(k), I.R.C. 1939.

In *Reighley*, the taxpayer attempted to draw the same distinction between a divorce and an annulment which respondent and Anne attempt here. In dispute were whether certain periodic payments pursuant to a support agreement were within the scope of section 22(k), the predecessor to section 71, I.R.C. 1954. The taxpayer in *Reighley* was a German national who married an American citizen and subsequently resided in the United States. During a visit to Berlin in 1936 she obtained a decree of annulment, having entered into a support agreement with her former husband while the suit was still pending. We held that by entering into the contract with her former husband, the taxpayer had elected under the then existing German Code to treat the annulment as a divorce for support purposes. The German Code then allowed an innocent spouse in an annulment situation to elect to treat the annulment as a divorce, insofar as the other party's duty of support was concerned. Because the German law would recognize that even an annulled marriage could entail a support obligation, we held that the annulment decree should be treated as a decree of divorce under section 22(k). We held, further, that the support agreement was incident to the decree and that the payments were made to discharge a legal obligation incurred because of the marital relationship. What we said in *Lily R. Reighley*, *supra* at 353, is appropriate here.

The contention * * * that the legal distinction between a *void ab initio* marriage and a marriage which is terminated from the time of divorce is controlling cannot be approved * * * In many states and territories of the United States, notwithstanding the legal differences between an annulment of a marriage and a divorce, the effect of a decree of annulment * * * will operate as in a divorce, from the time of the decree, and because of that *permanent alimony may be granted.* [Emphasis added.]

Actually, in *Reighley*, as in the instant case, the annulment was granted because of personal "defects" existing in the husband prior to the marriage and the marriage under local law would have been considered a nullity or void from the outset and not merely from the date of the decree. *Lily R. Reighley*, *supra* at 346. Yet we held explicitly that the periodic payments under the support agreement were in discharge of a legal obligation which was incurred by the husband because of the marital relation. *Lily R. Reighley*, *supra* at 355.

Without becoming mired in the State law distinctions between void and voidable marriages, or the other intricacies of annulment generally, we conclude and hold that the payments here in question were made in recognition of George's obligation to maintain or support Anne and "because of the marital or family relationship."

The parties themselves recognized the support obligation by entering into a written support and separation agreement, thus obviating the possibility that alimony would be an issue in the formal proceeding to dissolve the marriage which followed. At that time and for some time thereafter a divorce was contemplated and sought. The fact that the pleadings were amended and an annulment prayed for and obtained later should not affect the result here. It would have been within the discretionary power of the Norfolk annulling court to award support payments to Anne in the absence of a prior settlement. The situation should be the same for section 71(a)(2) purposes as if the parties entered into a separation agreement and later took no steps to dissolve the marriage.

We conclude that even where an annulment is subsequently decreed, periodic payments made to the wife under a prior written separation agreement entered into in contemplation of divorce between the parties are made because of the marital or family relationship and constitute taxable income to the payee wife under the express terms of section 71(a)(2). A contrary result is not required simply because an annulment, as opposed to a divorce, is eventually obtained.

There is no suggestion in the evidence before us or in the arguments of the parties that the payments were made to effect a property settlement or division between the parties and we have found that the periodic payments were agreed upon and made for Anne's general support. We recognize that the essential meaning of the statutory phrase "payments * * * made * * * because of the marital or family relationship" in section 71(a)(2) is that the payments be of the nature of alimony payments and in recognition of an obligation to provide support. See *Bernatschke* v. *United States*, 364 F. 2d 400 (Ct. Cl. 1966). As the Court of Claims said in *Bernatschke* (p. 404) :

the nub of the problem is * * * to determine whether or not * * * [the] former husband * * * paid * * * by virtue of an obligation to support [his former wife] which was imposed on him by their marital relationship. This is a question that depends upon the substance of the transaction and the true intent of the parties, rather than on the labels or formal provisions of the written contract or divorce decree.

Anne urges that the payments to her were designed to equal her lost survivorship benefits, and are precluded from being for her general support, or in recognition of George's marital obligations to her. We cannot agree and on the contrary can only conclude and hold that the payments were for Anne's support and were merely measured by Anne's lost benefits so recently enjoyed, not in any sense for damages, restitution for lost income or for other alleged wrongs. In the presence of so many factors usually thought to indicate that questioned payments are for support we can only conclude and hold that the payments

were in the nature of alimony. *Bernatschke* v. *United States, supra* at 408.

George is entitled to deduct the amounts he paid Anne pursuant to the agreement of August 27, 1958, as amended, under section 215; these amounts constitute gross income to Anne under section 71(a)(2) for the reasons given above.

The determination of respondent is accordingly sustained in Anne's case. To reflect required adjustments in accordance with this opinion in George's case allowing him a deduction for the full amount paid to Anne in 1961, a Rule 50 computation will be required.

> *Decision will be entered for respondent in docket No. 858–65.*
>
> *Decision will be entered under Rule 50 in docket No. 884–66.*