WILLIAM C. WRIGHT AND ELLEN W. WRIGHT, ET AL.,[1] PETITIONERS v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 830–72, 1356–72, 1991–72, 4104–72. Filed June 25, 1974.

[1] Cases of the following petitioners are consolidated herewith: Jean W. Wright, docket No. 1356–72; Jean W. Wright, docket No. 1991–72; and William C. Wright and Ellen W. Wright, docket No. 4104–72.

*Gerald J. Kahn* and *John M. Byers*, for the petitioners in docket Nos. 830–72 and 4104–72.

*Bruce C. O'Neill*, for the petitioner in docket Nos. 1356–72 and 1991–72.

*Michael W. Ford*, for the respondent.

OPINION

Scott, *Judge:* Respondent determined deficiencies in the Federal income tax of petitioners William C. and Ellen W. Wright in the amounts of $8,603.13, $14,963.76, and $14,367.14 for the calendar years 1968, 1969, and 1970, respectively. Respondent determined deficiencies in the Federal income tax of petitioner Jean W. Wright in the amounts of $6,667.59, $7,330.41, and $7,093.34 for the calendar years 1968, 1969, and 1970, respectively.[2]

The parties have disposed of some of the issues by agreement, leaving for decision the following:

(1) Whether the cash payments made by William C. Wright during the calendar years 1968, 1969, and 1970 to his former wife, Jean W. Wright, are includable in her gross income for such years as alimony under the provisions of section 71, I.R.C. 1954,[3] and consequently deductible for such years by William C. and Ellen W. Wright under the provisions of section 215; and

(2) Whether annual premiums paid by William C. Wright during the calendar years 1968, 1969, and 1970 on a term life insurance policy

---

[2] Respondent has taken an inconsistent position with respect to his deficiency determinations against petitioners William C. and Ellen W. Wright and petitioner Jean W. Wright.

[3] All references are to the Internal Revenue Code of 1954.

owned by his former wife, Jean W. Wright, are includable in her gross income for such years as alimony under the provisions of section 71 and consequently deductible for such years by William C. and Ellen W. Wright under the provisions of section 215.

All the facts have been stipulated and are found accordingly.

Petitioners William C. Wright (William) and Ellen W. Wright, husband and wife, were residents of Milwaukee, Wis., at the time of the filing of their petitions in this case. They filed their joint Federal income tax returns for the calendar years 1968, 1969, and 1970 at the Internal Revenue Service Center, Kansas City, Mo.

Petitioner Jean W. Wright (Jean) was a resident of Cedarburg, Wis., at the time of the filing of her petitions in this case. She filed her Federal income tax returns for the calendar years 1968, 1969, and 1970 at the Internal Revenue Service Center, Kansas City, Mo.

Jean and William filed a joint Federal income tax return for the calendar year 1967.

Jean was born on January 22, 1922, and William was born on February 10, 1921. On January 31, 1948, Jean and William were married in Milwaukee, Wis. Two children were born of their marriage, one on July 22, 1950, and the other on March 25, 1952.

On April 28, 1967, William commenced an action in the Circuit Court for Milwaukee County seeking an absolute divorce from Jean and the custody of their minor children. On August 17, 1967, Jean filed an answer seeking dismissal of William's complaint and asking for support and maintenance of herself and the minor children. On October 4, 1967, Jean filed a counterclaim asking for an absolute divorce from William, alimony and support money, a division of property, attorneys' fees, costs, and custody of the minor children.

On October 4, 1967, the action for divorce came to trial before Judge L. J. Foley, Jr., of the Circuit Court for Milwaukee County, Wis. At that time, William's attorney informed the court that no evidence would be introduced in support of the complaint and that the parties would proceed on Jean's counterclaim.

At the trial William and Jean, relying on a statement of assets and liabilities prepared by William of the property they owned, entered into a stipulation in open court with regard to disposition of property owned by each of them, custody of the minor children, alimony, attorneys' fees, and court costs. The stipulation was taken by stenographic notes by the court reporter and later transcribed, the transcript being certified as true and correct by the reporter under date of October 13, 1967. The stipulation of the parties, with some amplification as to Jean's rights of visitation to the children, was accepted and adopted by the court in its findings of fact, conclusions

of law, and judgment orally made by the judge at the hearing and included in the transcript of the hearing. This oral statement included the conclusion of law by the court that based on her counterclaim Jean "is entitled to an absolute divorce." It was stipulated that William and Jean had a net worth in the amount of $1,065,122 which consisted of the following:

ESTATE OF WILLIAM C. AND JEAN WRIGHT

*Assets*

| | | |
|---|---:|---:|
| Farm and improvements | | $121, 500 |
| Farm furnishings | | 20, 000 |
| Total | | 141, 500 |
| Encumbrances: | | |
| Mortgage—Hillmann | $8, 500 | |
| Mortgate—P. Jennings | 5, 500 | |
| Mortgage—Lueders | 3, 266 | 17, 266 |

| | | |
|---|---:|---:|
| Net asset value | | $124, 234 |
| Residence and rear parcel (per appraisal 6/10/67) | 135, 000 | |
| Contents, furnishings, and jewelry (per appraisal 1959) | 80, 000 | |
| Total | | 215, 000 |
| Investments (per report 5/1/67): | | |
| William C. Wright portfolio | 616, 470 | |
| Jean W. Wright | 139, 518 | |
| Total investments | | 755, 988 |
| Automobiles—antique and other | | 24, 900 |
| Livestock and animals | | 48, 000 |
| Notes receivable | | 1, 000 |
| Total assets | | 1, 169, 122 |

*Liabilities*

| | |
|---|---:|
| First Wisconsin National Bank (Jean Wright maker; cosigned by William Wright) | 24, 000 |
| First Wisconsin National Bank (William Wright maker) | 20, 000 |
| Fall River Foundry—due from William Wright, officer | 60, 000 |
| Total liabilities | 104, 000 |

Such assets were owned by William and Jean as follows:

*Jean*

| | | |
|---|---:|---:|
| Farm and improvements | | $121, 500 |
| Contents, furnishings, and jewelry | | 8, 000 |
| Investments—Jean Wright | | 139, 518 |
| | | 269, 018 |
| Less: Mortgages | $17, 266 | |
| Note | 24, 000 | 41, 266 |
| Net assets | | 227, 752 |

*William*

| | | |
|---|---:|---:|
| Farm furnishings | | $20,000 |
| Residence and rear parcel | | 135,000 |
| Contents, jewelry, and furnishings | | 72,000 |
| Investments | | 616,470 |
| Automobiles | | 24,900 |
| Livestock and animals | | 48,000 |
| Notes receivable | | 1,000 |
| | | 917,370 |
| Less: Notes payable | $20,000 | |
| | 60,000 | 80,000 |
| Net assets | | 837,370 |

The aforementioned assets owned by Jean were either personal property inherited from her mother or purchased with portions of $120,000 inherited from her mother.

The aforementioned assets owned by William were purchased by him.

At the hearing on October 4, 1967, William and Jean were each represented by counsel. No reference was made at the hearing to William's income or to Jean's need for support. Jean answered affirmatively under oath when asked by her attorney whether she understood that alimony was to be denied. William, having heard the provisions of his stipulation with Jean as stated by Jean's attorney, was asked by his attorney whether that stipulation was in fact the agreement he had entered into with Jean should the court see fit to grant a divorce and answered that it was. William was asked by his attorney whether he understood that there was to be a full and complete division of estate in lieu of any claim upon him by Jean for alimony and answered "Yes."

Following the hearing, Jean's attorney submitted proposed findings of fact and conclusions of law. The conclusions of law provided in part as follows:

Twenty-first. That alimony be and hereby is denied.

\* \* \* \* \* \* \*

Twenty-fifth. (a) That as and for a complete division of estate and to complete the division of property of the parties, the plaintiff shall pay to the defendant the sum of $228,000.00 within ten and one-half (10½) years of October 4, 1967, \* \* \*

On December 8, 1967, a hearing was held in the Circuit Court of Milwaukee County with regard to William's objection to the proposed findings of fact and conclusions of law submitted by Jean's attorney, particularly the aforementioned paragraphs numbered 21 and 25 which William contended did not conform with the under-

standing when the stipulation was made a part of the record at the trial on October 4, 1967. At the hearing on December 8, William's attorney submitted to the court proposed paragraphs for the conclusions of law which stated in part as follows:

25a That alimony be and hereby is denied and in lieu of said alimony and in full satisfaction of any claim therefore, and as a complete division of estate and to complete the division of property of the parties, the plaintiff shall pay to the defendant the sum of $228,000.00 in 10½ years of entry of judgment said sum to be paid at the rate of $2,000.00 each month for a period of six months and $1,800.00 each month thereafter for a period of 10 years.

At this hearing Jean's attorney stated that the installment payments of the lump sum of $228,000 were not considered as alimony and that it was in truth and in fact a division of the estate. William's attorney stated the reason that a 10½-year period of time for payment of the sum of $228,000 was provided for in the stipulation was to permit William an income tax deduction for the payments and that the property division was entered into with the express understanding of the parties that it was in lieu of alimony. Jean's attorney stated that he considered at the time the 10½-year period was agreed to that Jean need not treat the payment as alimony and that she would not report it as alimony.

The court took the matter under advisement, stating there are substantial financial problems involved in the wording and the court must word the findings in accordance with the judgment that was made or the findings of fact and conclusions of law that were made at the time of the trial.

On January 29, 1968, the findings of fact and conclusions of law submitted by Jean's counsel with certain modifications to paragraphs other than paragraph 25a were adopted by the Circuit Court.

The written formal judgment of divorce was entered by the Clerk of the Circuit Court for Milwaukee County, Wis., on February 2, 1968. It provided in part:

IT IS ADJUDGED:

First. That the bonds of matrimony heretofore subsisting between the plaintiff, William C. Wright, and the defendant, Jean Wright, be and the same are hereby dissolved and they are forever freed from the obligations thereof, provided, that the judgment so far as it affects the marital status of the parties shall not be effective until the expiration of one year from the date of the granting of said judgment, except that it shall immediately bar them from cohabiting together and it may be reviewed on appeal during such period. But in case either party dies within said period, such judgment, unless vacated or reversed, shall be deemed to have entirely severed the marriage relation immediately before such death.

Second. That neither of the parties to this action shall marry again until one year after the granting of said judgment on the 4th day of October, 1967, and the marriage of either of the parties to this action solemnized before the expira-

tion of one year from the date of the granting of this judgment shall be null and void.

The judgment of divorce awarded Jean (1) the farm and improvements, owned by Jean; (2) the farm furnishings of $20,000, except as otherwise provided; (3) the personal property located at the residence which was owned or inherited by Jean or selected by her; (4) all other personal property in Jean's possession, except as otherwise provided; (5) her investment portfolio; (6) a 1964 Pontiac stationwagon; (7) a 1919 electric automobile; and (8) a horse, a dog, goats, and cats.

The judgment of divorce awarded William (1) the residence; (2) the residence furnishings, except as otherwise provided; (3) all personal property in William's possession, except as otherwise provided; (4) his investment portfolio; (5) all automobiles except for the 1964 Pontiac and the 1919 electric automobile; (6) the livestock on the farm; (7) the chain link fence at the farm; (8) the personal effects of William at the farm; and (9) a note receivable in the amount of $1,000.

The judgment of divorce obligated William (1) to satisfy or assume the existing mortgage encumbering the farm in the amount of $17,266; (2) to pay all farm expenses until all the livestock awarded to him were removed; (3) to pay Jean $250 per month commencing November 1, 1967, for rental of the part of the farm used by him until the animals were removed; (4) to assume and pay the note made by Jean and cosigned by William in the amount of $24,000; (5) to pay until her remarriage all Jean's medical and related expenses in excess of $250 per year; (6) to replace the 1964 Pontiac automobile in or by 1970 and again in or by 1975 with a new substantially equivalent automobile; (7) to pay until Jean's death or remarriage her investment management fees of "Fiduciary Counsel, Inc." in excess of $100 per year; (8) to pay Jean's attorneys' fees in the amount of $7,500; (9) to satisfy the note made by William in the amount of $20,000; and (10) to satisfy the note made by William as an officer of his company in the amount of $60,000.

Jean was obligated under the judgment of divorce to sell 600 shares of stock that she owned in William's company to him at its present book value which was $9,022.

Custody of the children was awarded to William. Further, the guardian ad litem's fee of $1,150 was shared equally between William and Jean.

The judgment of divorce further provided as follows:

Twenty-second. That alimony be and hereby is denied.

Twenty-third. That the plaintiff, William C. Wright, shall maintain the present only $200,000.00 of life insurance, being with the Northwestern Mutual Life Insurance Company, Policy No. 5 531 595, date of issuance, August 22, 1963 [sic], of which the defendant is owner in full force and effect and shall maintain the defendant as beneficiary thereon for as long as said policy shall provide

and at least to age 65 and shall keep the defendant as beneficiary of all the proceeds of said policy until she dies or remarries; that if there are any proceeds of this insurance that the defendant collects, whatever is not used by the defendant in her lifetime shall be left at the time of her death to the children of the parties, either by her will or by trust or by separate trusts in her will.

        \*        \*        \*        \*        \*        \*        \*

Twenty-sixth. (a) That as and for a complete division of estate and to complete the division of property of the parties, the plaintiff be and he hereby shall pay to the defendant the sum of $228,000.00 within ten and one-half (10½) years of October 4, 1967; and payable on the following terms: No less than $2,000.00 per month be paid by the plaintiff to the defendant for the first six months; that thereafter the plaintiff shall pay to the defendant no less than the sum of $1,800.00 per month for the balance of the term of the payment of the $228,000.00 specified herein.

(b) Further, that the payment of the sum of $228,000.00 shall be secured by sufficient marketable securities in the investment portfolio awarded to the plaintiff, William C. Wright, which stock shall be placed in escrow with the First Wisconsin Trust Company under suitable terms and conditions to secure the payment of the money awarded to the defendant herein, including, but not limited to the following terms: that the stocks which are placed in such escrow may be replaced by other stocks of equal or greater value or such stocks may be removed as may not be necessary to guarantee the payment of the balance due upon the payment of $228,000.00 and only such amount of stock need be maintained in escrow as may be reasonably necessary to guarantee the payment of the balance due and owing at the given time.

(c) Further, that in case of the death of the plaintiff, William C. Wright, prior to the payment in full of the $228,000.00 the amount owing upon the balance due the defendant shall be paid to the defendant promptly; however, the choice of whether such amount shall be paid from the estate of the defendant, William C. Wright, or from this escrow account shall be at the choice of the duly appointed representative of the plaintiff. However, if the estate is not liquid or is insolvent, or impaired in any manner, then the escrow account or the guarantee of the escrow account is not waived by this provision and the provision is meant to give the choice of only where the amount is to be paid from if there is a choice.

The value of the assets awarded to each Jean and William by the divorce decree exclusive of the 600 shares of Fall River Foundry sold by Jean to William was as follows:

*Jean*

| | |
|---|---:|
| Farm and improvements | $121,500 |
| Farm furnishings | 20,000 |
| Contents, jewelry, and furnishings | 8,000 |
| Investment portfolio | 139,518 |
| Pontiac car | Unknown |
| Antique electric car | Unknown |
| Horse, cats, and goats | Unknown |
| Miscellaneous property | Unknown |
| Approximate value at a discount rate of 6 percent of $228,000 lump-sum payment receivable from William | 170,000 |
| | 459,018 |

*William*

| | |
|---|---|
| Residence and rear parcel | $135,000 |
| Contents, furnishings, and jewelry | 72,000 |
| Investment portfolio | 616,470 |
| Automobiles | 24,900 |
| Livestock and animals | 48,000 |
| Notes receivable | 1,000 |
| Miscellaneous property | Unknown |
| | 897,370 |

| | | |
|---|---|---|
| Less: Previous existing personal liabilities | $20,000 | |
| | 60,000 | |
| | 80,000 | |
| Liabilities assumed | 41,266 | |
| | 121,266 | |
| Approximate value of $228,000 lump-sum payment payable to Jean | 170,000 | 291,266 |
| | | 606,104 |

The October term of the Circuit Court of Milwaukee County during which October 4, 1967, fell expired on December 31, 1967. No appeal was taken by either party from the judgment of divorce of the Milwaukee County Circuit Court nor were any proceedings to modify or vacate the judgment instituted by either party.

In May 1968 Jean and William each executed a mutual release which stated in part:

WHEREAS, said judgment of divorce which was entered February 2, 1968 provided for, among other things, a property settlement between the parties in lieu of alimony; * * *

During the calendar years 1968, 1969, and 1970, William paid Jean as installments on the principal sum of $228,000 the amounts of $22,200, $21,600, and $21,600, respectively.

On May 21, 1963, Jean applied to Northwestern Mutual Life Insurance Co. for a 10-year renewable term life insurance policy on the life of William in the face amount of $200,000. Policy No. 5 531 595 was issued by Northwestern Mutual Life Insurance Co. on August 10, 1963, in the face amount of $200,000 on the life of William, which policy is and has since its issuance been owned by Jean. Jean, as sole owner of the policy, is obligated to pay the premiums due on the policy on an annual basis and under the policy provisions may change the beneficiaries. Jean is presently the sole beneficiary under the policy. The policy provided it could be converted at any time until August 10, 1973, to a new level annual premium life or endowment plan in the same underwriting classification and for the same amount of insurance as the existing policy. The original policy was

lost or destroyed and a replacement policy was issued on June 8, 1973.

During the calendar years 1968, 1969, and 1970, William paid Northwestern Mutual Life Insurance Co. as net premiums on the aforementioned policy the sums of $1,505.50, $1,459.50, and $1,415.50, respectively. The gross premium in each of the years 1968, 1969, and 1970 amounted to $2,229.50 and the dividends applied in reduction of the gross premium in 1968, 1969, and 1970 amounted to $749, $840, and $884, respectively.

The 1-year term premiums in the years 1968, 1969, and 1970 for $200,000 of term insurance on the life of a male born on February 10, 1921 (the date of birth of William), based on "P.S. No. 58" rates are $1,464, $1,578, and $1,706, respectively.

William, on his joint Federal income tax returns for the calendar years 1968, 1969, and 1970, claimed deductions under section 215 for alimony payments of $22,775, $24,339, and $28,113, respectively.

Jean, on her Federal income tax returns for the calendar years 1968, 1969, and 1970, did not include in her gross income any payments made to her on her behalf by William, but did include in 1970 the $4,500 representing the value of an automobile purchased for her by William.

Respondent in his notice of deficiency to William dated November 26, 1971, increased his income as reported for the calendar year 1968 by $22,200, representing the claimed alimony deduction for installment payments on the sum of $228,000 during such year. In his petition, William alleges that respondent erroneously failed to allow a deduction as alimony for the payment of $1,505.50 made by William on a life insurance policy owned by Jean.

Respondent in his notice of deficiency to William increased his income as reported by disallowing his claimed deduction for alimony of $24,339 for 1969 and $23,250 of his claimed deduction for alimony for 1970, of which $21,600 for each year represents installment payments on the $228,000 principal sum and $1,460 for 1969 and $1,415.50 for 1970 represent premium payments on a term life insurance policy owned by Jean.

Respondent explained the disallowance of the disputed deductions for alimony paid to Jean in the years 1968, 1969, and 1970 with the statement that:

it has not been established that such amounts are includible as income to your former wife under section 71 of the Internal Revenue Code. Accordingly, you are not entitled to the deductions under section 215 of the Internal Revenue Code.

Respondent in his notice of deficiency to Jean increased her income for 1968 as reported by the amount of $22,200, representing installment payments received by her from William on the sum of $228,000, and $1,505.50, representing life insurance premiums paid on behalf of Jean by William.

Respondent in his notice to Jean increased her income as reported for 1969 and 1970 by $23,060 and $22,776, respectively, representing $21,600 of installment payments received by Jean from William for each year and $1,460 of life insurance premiums paid on behalf of Jean by William for 1969 and $1,176 [4] of life insurance premiums paid on behalf of Jean by William for 1970.

Respondent explained that the increases in her taxable income for the calendar years 1968, 1969, and 1970 do "not qualify as excludable installment payments since the payments are to be paid to you over a period ending more than 10 years from the date of the decree," and that the amounts of $1,505.50, $1,460, and $1,176 for such years, respectively, "represent alimony income."

Section 71(a) [5] provides that if a wife is divorced or legally separated from her husband she must include in her taxable income periodic payments received by her in discharge of a legal obligation arising out of the marital relationship and "imposed on or incurred by the husband under the decree or under a written instrument incident to such divorce or separation." Pursuant to the provisions of section 215(a) [6] a husband is entitled to deduct from his taxable income such periodic payments made to his divorced wife in the year paid.

Jean's primary position is that the installment payments received by her under the divorce decree rendered on October 4, 1967, represented payments of a property settlement and were not payments in discharge of an obligation incurred by her former husband because of the marital or family relationship and therefore these payments are not includable in her income under section 71(a)(1). In the alternative Jean contends that these payments are not includable in her income under section 71(a)(1) since they are excluded by the pro-

---

[4] The actual net premium payment paid by William in 1970 was in the amount of $1,415.50.

[5] SEC. 71. ALIMONY AND SEPARATE MAINTENANCE PAYMENTS.
  (a) GENERAL RULE.—
    (1) DECREE OF DIVORCE OR SEPARATE MAINTENANCE.—If a wife is divorced or legally separated from her husband under a decree of divorce or of separate maintenance, the wife's gross income includes periodic payments (whether or not made at regular intervals) received after such decree in discharge of (or attributable to property transferred, in trust or otherwise, in discharge of) a legal obligation which, because of the marital or family relationship, is imposed on or incurred by the husband under the decree or under a written instrument incident to such divorce or separation.

[6] SEC. 215. ALIMONY, ETC., PAYMENTS.
  (a) GENERAL RULE.—In the case of a husband described in section 71, there shall be allowed as a deduction amounts includible under section 71 in the gross income of his wife, payment of which is made within the husband's taxable year. No deduction shall be allowed under the preceding sentence with respect to any payment if, by reason of section 71(d) or 682, the amount thereof is not includible in the husband's gross income.

vision of section 71(c)[7] as the installment payments discharging an obligation the principal sum of which is specified in money are not payable over a period of more than 10 years from the date of the final divorce decree on October 4, 1968. Jean also contends the payments of life insurance premiums by her former husband on a term life insurance policy owned by her do not constitute a sufficient economic benefit to her to qualify the payments as taxable income to her.

William's primary position is that the installment payments he was required to make under the decree rendered on October 4, 1967, and the court-transcribed oral stipulation that he and Jean entered into during the divorce proceedings, which was substantially adopted in such decree, are in discharge of a legal obligation imposed on him because of the marital relationship. Further he contends such payments are periodic under section 71(a)(1) pursuant to section 71(c) as they discharge an obligation the principal sum of which is specified in the decree and stipulation as payable in money over a period extending more than 10 years from the date of the decree when rendered, or from the date 60 days after the expiration of the term of the court during which the decree was pronounced, or from the date the stipulation as transcribed in the divorce proceedings became effective. Therefore he concludes the payments are includable as alimony in his former wife's income and deductible by him. Further William contends that Jean received a valuable economic benefit by virtue of the premiums he paid on the term life insurance policy which Jean owned on his life to the extent of either his actual premium payments or the "P.S. 58" costs, the cost of a 1-year term insurance policy on the life of a male of his age.

As we have noted, respondent took inconsistent positions as to these payments with respect to Jean and William in his notices of deficiencies. Without waiving his inconsistent positions, respondent on brief argues in favor of Jean and against William except with regard to the payments being over a period of more than 10 years from the date of the divorce decree which respondent argues is October 4, 1967.

We have recognized on a number of occasions that where there is a

[7] SEC. 71(c). PRINCIPAL SUM PAID IN INSTALLMENTS.—

(1) GENERAL RULE.—For purposes of subsection (a), installment payments discharging a part of an obligation the principal sum of which is, either in terms of money or property, specified in the decree, instrument, or agreement shall not be treated as periodic payments.

(2) WHERE PERIOD FOR PAYMENT IS MORE THAN 10 YEARS.—If, by the terms of the decree, instrument, or agreement, the principal sum referred to in paragraph (1) is to be paid or may be paid over a period ending more than 10 years from the date of such decree, instrument, or agreement, then (notwithstanding paragraph (1)) the installment payments shall be treated as periodic payments for purposes of subsection (a), but (in the case of any one taxable year of the wife) only to the extent of 10 percent of the principal sum. For purposes of the preceding sentence, the part of any principal sum which is allocable to a period after the taxable year of the wife in which it is received shall be treated as an installment payment for the taxable year in which it is received.

division of property of the parties to a divorce and the husband makes payments in satisfaction of property rights of the wife the amounts received by the wife are capital in nature and are neither includable in her gross income under section 71 nor deductible by the husband under section 215. *Lewis B. Jackson, Jr.*, 54 T.C. 125, 129 (1970). See sec. 1.71–1(c)(4), Income Tax Regs. We must therefore first determine whether William's legal obligation was incurred to compensate Jean for her alleged substantial property rights or "because of their marital or family relationship." Sec. 71(a)(1).

Jean argues that the sum of $228,000 to be paid to her was payment for her inchoate interest in William's property at the time of the divorce under Wis. Stat. Ann. section 247.26 (1957), relying on cases as *McCombs* v. *Commissioner*, 397 F. 2d 4 (C.A. 10, 1968), affirming a Memorandum Opinion of this Court, and *Bernatschke* v. *United States*, 364 F. 2d 400 (Ct. Cl. 1966).

William argues the aforementioned payments were necessarily payment for his legal obligation of support arising from the marital relationship as Jean did not exchange any interests in property for such payments, relying on such cases as *William M. Joslin, Sr.*, 52 T.C. 231 (1969), affd. 424 F. 2d 1223 (C.A. 7, 1970); *Porter* v. *Commissioner*, 388 F. 2d 670 (C.A. 6, 1968), affirming per curiam a Memorandum Opinion of this Court; *Blanche Curtis Newbury*, 46 T.C. 690 (1966).

The determination of whether the cash installment payments of the $228,000 lump sum constitute a settlement resulting from Jean's property rights or from Jean's rights arising under the marital relationship, rests upon the surrounding facts and circumstances. *William M. Joslin, Sr., supra; Blanche Curtis Newbury, supra; Ann Hairston Ryker*, 33 T.C. 924, 929 (1960). Labels assigned to payments to a spouse by the parties in their agreement or by the divorce decree are not conclusive. *Wilma Thompson*, 50 T.C. 522 (1968); *Elizabeth H. Bardwell*, 38 T.C. 84, 89, 90 (1962), affd. 318 F. 2d 786 (C.A. 10, 1963). As we pointed out in *Wilma Thompson*, at page 525, the text of section 71 does not use the word "alimony" and the regulations amplify the statute by explaining that section 71(a) applies only to payments made because of the marital relationship and in recognition of the general obligation to support. Sec. 1.71–1(b)(4), Income Tax Regs. Nevertheless, many cases refer to these obligations arising because of the marital relationship as "alimony." While the fact that the payment would not terminate upon the death or remarriage of the wife is part of the evidence to be considered, this fact is not conclusive that such payments are being made pursuant to a settlement of the respective property rights of the spouses. The intent of the parties is a necessary factor in determining the nature of the payment. *Phinney* v. *Mauk*, 411 F. 2d 1196 (C.A. 5, 1969).

On the basis of the record before us we conclude that the amounts of $22,200, $21,600, and $21,600 which Jean received in 1968, 1969, and 1970, respectively, were in substance and were intended by the parties to be payments in discharge of a legal obligation which was imposed on her former husband, William, because of the marital relationship.

In reaching this conclusion we have found persuasive that Jean, at the time of the divorce, did not own any property in exchange for which she was to receive the sum of $228,000. Jean received all the property she owned at the time of the divorce and additionally the lump sum of $228,000, with a present value of approximately $170,000. Therefore, these payments were not received by Jean in satisfaction of her property rights. *Porter* v. *Commissioner*, 388 F. 2d 670 (C.A. 6, 1968), affirming per curiam a Memorandum Opinion of this Court; *Taylor* v. *Campbell*, 335 F. 2d 841 (C.A. 5, 1964); *Marion R. Hesse*, 60 T.C. 685 (1973); *William M. Joslin, Sr., supra; Wilma Thompson, supra; Blanche Curtis Newbury, supra; Elizabeth H. Bardwell, supra;* cf. *Mills* v. *Commissioner*, 442 F. 2d 1149 (C.A. 10, 1971), affirming 54 T.C. 608 (1970); *Walter H. Weiner*, 61 T.C. 155 (1973), on appeal (C.A. 2, Feb. 1, 1974); *Enid P. Mirsky*, 56 T.C. 664 (1971); *Edith M. Gerlach*, 55 T.C. 156 (1970).

While Jean transferred 600 shares of Fall River Foundry stock to William at the agreed price of book value the record in no way indicates that this price did not reflect the value of such shares. In fact, Jean does not contend that she was not adequately compensated for this stock. In her brief Jean recognizes that in addition to receiving all her own property she received property owned by William consisting of furnishings valued at $20,000, a Pontiac automobile, an antique automobile, and the discharge of her liabilities in the amount of $41,266.

Jean's only contention that the $228,000 to be paid in installment payments was a property settlement is that she relinquished her property rights under Wis. Stat. Ann. section 247.26 (1957)[8] for the

---

[8] Wis. Stat. Ann. sec. 247.26 (1957), provides:

Upon every divorce from the bond of matrimony for any cause excepting that of adultery committed by the wife, and also upon every divorce from bed and board, the court may further adjudge to the wife such alimony out of the estate of the husband, for her support and maintenance, and such allowance for the support, maintenance and education of the minor children committed to her care and custody as it shall deem just and reasonable, and the court may finally divide and distribute the estate, both real and personal, of the husband and so much of the estate of the wife as shall have been derived from the husband, between the parties and divest and transfer the title of any thereof accordingly, having always due regard to the legal and equitable rights of each party, the ability of the husband, the special estate of the wife, the character and situation of the parties and all the circumstances of the case; but no such final division shall impair the power of the court in respect to revision of allowances for minor children under section 247.25. No such judgment shall divest or transfer title to real estate unless such judgment or a certified copy thereof is recorded in the office of the register of deeds of the county in which such real estate is situated.

disputed payments. However, Jean's inchoate rights in her husband's property under a common law jurisdiction such as Wisconsin have not been recognized as reaching the dignity of such an interest as to support a division of property among coowners. As the Supreme Court stated in *United States* v. *Davis*, 370 U.S. 65, 70, 71 (1962), in dealing with the taxability to the husband of the value over the basis of property transferred by a husband to a wife in a divorce settlement, "the inchoate rights granted a wife in her husband's property * * * do not even remotely reach the dignity of co-ownership" and "the rights of succession and reasonable share [upon dissolution of the marriage] do not differ significantly from the husband's obligations of support and alimony." The Supreme Court further stated that such inchoate rights "partake more of a personal liability of the husband than a property interest of the wife" and while "these marital rights may ultimately result in the ownership of some of the husband's property * * * this happenstance does not equate the transaction with a division of property by co-owners."

In our view these principles must be borne in mind in determining whether payments made by a husband to a wife are payments made because of the marital relationship and in recognition of the husband's obligation to support the wife. Under Wis. Stat. Ann. section 247.26 (1957), the division of property of the husband is a discretionary and not a mandatory duty of the trial court. *Jordan* v. *Jordan*, 44 Wis. 2d 471, 171 N.W. 2d 385 (1969). Cf. *Lewis B. Jackson, Jr., supra.* One of the factors to be considered by the divorce court in determining whether to grant property of the husband to the wife and the amount of the husband's property to be granted to the wife is whether the wife receives alimony. *Lacey* v. *Lacey*, 45 Wis. 2d 378, 173 N.W. 2d 142 (1970) ; *Radandt* v. *Radandt*, 30 Wis. 2d 108, 140 N.W. 2d 293 (1966). This record is clear that Jean did not surrender any property interests or give up anything that is recognized as supporting a division of property in exchange for the disputed payments other than her right to alimony.

Although in *Bernatschke* v. *United States, supra*, on which Jean relies, the Court of Claims held that annuity contracts purchased by the husband for the benefit of his wife were not based on the marital obligation to support but were intended to be in the nature of a division of property in settlement of the wife's inchoate dower rights, the facts of that case are distinguishable from the instant case. In *Bernatschke* the evidence showed that the parties never discussed the payment of alimony to the wife, that the wife did not request alimony payments, and the husband did not mention such payments. In fact, the husband discussed only the dower rights of the wife. The record before us here contains no showing that the inchoate rights of Jean in

William's property were ever discussed by either party or were the subject of negotiations preceding the oral stipulation or of the oral stipulation itself, or of the award by the divorce court. In fact the record demonstrates that alimony was the subject considered by the parties both before and during the divorce proceedings. In their mutual release signed shortly after the entry of the divorce decree, the parties referred to a property settlement "in lieu of alimony." This is further indication that Jean considered she was giving up her right to support sought in her counterclaim in return for the installment payments over a 10½-year period. Section 247.26 of the Wisconsin Statutes confers upon a divorce court the authority to adjudge to the wife such alimony out of the estate of the husband for her support as it deems just and reasonable and to divide the estate of the husband between the parties having regard to the legal and equitable rights of each party. This statute contemplates that both alimony payments and division of the estate of the husband are means of discharging the obligation of the husband upon termination of the marital relationship to continue to support his wife in the manner to which she has become accustomed. *Wisconsin Department of Taxation* v. *Siegman*, 24 Wis. 2d 92, 128 N.W. 2d 658 (1964) ; *Tonjes* v. *Tonjes*, 24 Wis. 2d 120, 128 N.W. 2d 446 (1964). See *Lacey* v. *Lacey, supra; Radandt* v. *Radandt, supra.*

This record suggests that Jean preferred and William was agreeable to a division of property rather than payment of alimony since under Wisconsin law the State court would be foreclosed from thereafter modifying its judgment. *Gray* v. *Gray,* 240 Wis. 285, 3 N.W. 2d 376 (1942).

Having determined the disputed payments are alimony in satisfaction of William's obligation to support and not a division of property, we must determine whether or not the disputed payments are periodic payments in discharge of a legal obligation which is imposed under a decree of divorce or separate maintenance or under a written instrument incident to such decree within the meaning of section 71 (a) (1). As the parties do not contend the payments are subject to any contingency, the payment of a principal sum by installments will qualify as a periodic payment only if the sum is payable over a period of more than 10 years from the date of the decree or of the written instrument incident to the divorce or separation. Sec. 71 (c) (2). The last installment payment was due and payable under the terms of the decree as orally rendered, the written decree, the final decree, and the stipulation, 10½ years from October 4, 1967, that being April 4, 1978. Consequently the obligation to pay pursuant to the decree or written instrument must commence prior to April 4, 1968, for the payments

to be considered periodic within section 71(a)(1). Cf. *William M. Joslin, Sr., supra.* The date when the obligation in this case came into existence depends on whether the obligation was incurred when the divorce decree was rendered on October 4, 1967; when the written decree was entered on February 2, 1968; when the divorce decree became final on October 4, 1968; when 60 days had expired after the term of the divorce court during which the decree was rendered, that being February 29, 1968; or when the stipulation was reduced to writing by the court reporter. In determining the source of the obligatory payments we must look to the applicable State law. *Gordon L. Munderloh,* 48 T.C. 452 (1967).

Jean contends the obligation was incurred under the divorce decree which became final on October 4, 1968, relying on *Riddell* v. *Guggenheim,* 281 F. 2d 836 (C.A. 9, 1960); *Commissioner* v. *Ostler,* 237 F. 2d 501 (C.A. 9, 1956), affirming a Memorandum Opinion of this Court; *Commissioner* v. *Evans,* 211 F. 2d 378 (C.A. 10, 1954), affirming 19 T.C. 1102 (1953); *Merle Johnson,* 50 T.C. 723 (1968); *Marriner S. Eccles,* 19 T.C. 1049 (1953), affirmed per curiam 208 F. 2d 796 (C.A. 4, 1953). *Merle Johnson* deals with the right of a husband to use "head of household" tax rates after the entry of an interlocutory decree of divorce. *Marriner S. Eccles* and *Commissioner* v. *Ostler* both deal with the right of a husband and wife to file a joint return after the entry of an interlocutory decree of divorce. The statutory provisions relevant to those cases are so different from the provisions of section 71 as to cause those cases not to be helpful in disposing of the issue here present. *Riddell* v. *Guggenheim* and *Commissioner* v. *Evans* deal with divorce decrees entered prior to the effective date of section 71(a)(3)[9] which was a new provision in the 1954 Code. See discussion of the effective date of this subsection in *John W. Furrow, Jr.,* 34 T.C. 931, 935 (1960), affd. 292 F. 2d 604 (C.A. 10, 1961). In our view the difference in the statutes applicable to the *Guggenheim* and *Evans* cases and those applicable in the instant case causes those cases to be inapposite to the instant case.[10]

[9] SEC. 71. ALIMONY AND SEPARATE MAINTENANCE PAYMENTS.
(a) GENERAL RULE.—
* * * * * * *
(3) DECREE FOR SUPPORT.—If a wife is separated from her husband, the wife's gross income includes periodic payments (whether or not made at regular intervals) received by her after the date of the enactment of this title from her husband under a decree entered after March 1, 1954, requiring the husband to make the payments for her support or maintenance. This paragraph shall not apply if the husband and wife make a single return jointly.

[10] Petitioner also relies on *Gordon M. Eno,* T.C. Memo. 1965–219. While the *Eno* case involved years governed by the provisions of sec. 71(a)(2) and (3) as contained in the 1954 Code, the facts there do not remotely resemble those in the instant case. In *Eno* the trial court entered a decree for a principal sum to be paid over a period of less than 10 years. The wife appealed, requesting an increase in the principal sum. The appellate court

William contends the obligation to make the installment payments to Jean was imposed by the divorce decree when rendered on October 4, 1967, such decree becoming effective when pronounced, relying on *Seiler* v. *Seiler*, 48 Wis. 2d 400, 180 N.W. 2d 627 (1970), and *Brackob* v. *Brackob*, 265 Wis. 513, 61 N.W. 2d 849 (1953). Alternatively William contends that the portion of the judgment concerning the disputed payments became legally binding on him on February 29, 1968, when such portion of the judgment concerning the disputed payments could not be modified or vacated as 60 days had lapsed from the expiration of the term of the court during which the judgment was rendered. William asserts again in the alternative that he and Jean entered in open court into an oral stipulation concerning in part William's payment of the installment obligation which was transcribed by the court reporter and such agreement was enforceable as it was in the nature of a contract under Wisconsin law. Consequently he urges the obligation arose on October 4, 1967, under a written instrument incident to the divorce. Under each of these circumstances William contends the 10-year period began to run from the moment the obligation arose, thereby qualifying the disputed payments as periodic under section 71(c)(2).

We conclude the disputed payments are periodic payments in discharge of a legal obligation imposed by the terms of both the oral judgment and the written decree which permit the principal sum specified in the decree to be paid in money over a period ending more than 10 years from the date of the judgment and the decree within the meaning of section 71(c)(2). William's legal obligation to pay the disputed payments was based on the oral pronouncement of the divorce court on October 4, 1967, which was later formally entered as a written judgment on February 2, 1968. Under the terms of the oral and written judgments the principal sum of $228,000 is payable over 10½ years from October 4, 1967. Since William and Jean were separated after October 4, 1967, and the judgment entered on that date required William to make the payments to Jean, the payments are specified in a decree provided for in section 71(a) and therefore

increased the principal sum but set the amount of the installment payments at a figure which extended the payments beyond 10 years. The trial court modified its decree in accordance with the appellate court's direction and the wife immediately filed a motion for rehearing with the appellate court, pointing out that since the time for payment under its holding extended over 10 years she would be required to include the payments in her gross income and would get a decreased net amount from that initially granted by the trial court and not an increased amount as intended by the appellate court. The appellate court then changed the required amount of installment payments so that the principal sum would be paid in less than 10 years. Under the facts present in the *Eno* case there was never any final order providing for installment payments over a period of more than 10 years. On rehearing, the appellate court merely corrected an inadvertent error in its original decision.

are payable over a period of over 10 years by such a decree and are periodic under section 71(c)(2).[11] See *Florence Korman*, 36 T.C. 654, 656 (1961), affirmed per curiam 298 F. 2d 444 (C.A. 2, 1962).

Jean and William reached an oral understanding that was accepted by the court in its oral judgment which was granted on October 4, 1967, and at that time became legally operative on the parties, excepting insofar as it affected the marriage status of the parties for 1 year thereafter. *Holschbach* v. *Holschbach*, 30 Wis. 2d 366, 141 N.W. 2d 214 (1966); *Brackob* v. *Brackob*, *supra;* Wis. Stat. Ann. sec. 247.37 (1957). The oral judgment was subsequently reduced to writing and entered on February 2, 1968. This written judgment specified in part that William was obligated to pay monthly installments on the principal sum of $228,000 commencing October 4, 1967, for a period which could extend 10½ years therefrom which period was more than 10 years from the date of the oral and written judgments. There has been no appeal of the oral judgment and its related written judgment or portions thereof within the time prescribed by statute of 1 year from the date when such judgment was granted on October 4, 1967. Wis. Stat. Ann. sec. 247.37 (1957). William's obligation to make the payments to Jean arose on October 4, 1967, when his agreement with Jean was confirmed in the judgment of the court rendered on that date. This obligation was reconfirmed in the written judgment entered on February 2, 1968. This obligation to make the installment payments extended over a period of over 10 years. The obligation was first to a wife separated from her husband by the entry of the divorce judgment on October 4, 1967, and to a divorced wife from 1 year thereafter. Under the law as it now stands, whether there is a status of separation or of divorce is immaterial since the statute covers payments in either category.

For the taxable year 1968 Jean is required to include in her gross income the amount of $22,200, and for each of the taxable years 1969 and 1970 the amount of $21,600 as alimony in accordance with section 71(a)(1) and (c)(2). William is entitled to deduct such amounts for each of those years pursuant to section 215(a).

The final issue is whether the premiums paid by William on the term life insurance policy owned by Jean are includable in Jean's income

[11] Sec. 1.71–1(b)(3)(i), Income Tax Regs., provides:

(3) *Decree for support.*—(i) Where the husband and wife are separated and living apart and do not file a joint income tax return for the taxable year, paragraph (3) of section 71(a) requires the inclusion in the gross income of the wife of periodic payments (whether or not made at regular intervals) received by her after August 16, 1954, from her husband under any type of court order or decree (including an interlocutory decree of divorce or a decree of alimony pendente lite) entered after March 1, 1954, requiring the husband to make the payments for her support or maintenance. It is not necessary for the wife to be legally separated or divorced from her husband under a court order or decree; nor is it necessary for the order or decree for support to be for the purpose of enforcing a written separation agreement.

under section 71(a)(1) and deductible under section 215 by William for the taxable years 1968, 1969, and 1970. The parties do not contend that these premium payments are not payments made in discharge of a legal obligation which because of the marital relationship is incurred by William. The premium payments are imposed under a decree for the same reasons as we have previously discussed. The payments are periodic as William was obligated to pay them over the lesser of his or Jean's life, an indefinite period, or 1987. The parties recognize Jean did not actually receive the premiums paid and the dispute centers on whether the premium payments were constructively received by Jean within the meaning of section 71(a). Jean contends the premium payments on the term insurance policy on the life of William made by him on her behalf as owner of the policy do not create taxable income to her as any benefit she might realize under the insurance policy is too contingent to have any present direct economic value, relying on *Seligmann* v. *Commissioner*, 207 F. 2d 489 (C.A. 7, 1953), reversing a Memorandum Opinion of this Court, and *William H. Brodersen, Jr.*, 57 T.C. 412 (1971). Further, Jean argues she did not receive any property of ascertainable value as she could not receive any proceeds under the policy unless, prior to January 22, 1987 (the date Jean becomes 65 years of age), her husband predeceased her and she remained unmarried. William, relying on *Stevens* v. *Commissioner*, 439 F. 2d 69 (C.A. 2, 1971), reversing a Memorandum Opinion of this Court, and *Melvin A. Christiansen*, 60 T.C. 456 (1973), contends that his payment of premiums provided Jean with a valuable economic benefit, measured by the actual premium payments or the "P.S. 58" costs, since Jean was or in the event of her death her estate, if it decided to start making the premium payments, would be the owner of the policy. Further William distinguishes *William H. Brodersen, Jr.*, *supra*, on the ground that the term insurance policy in that case provided security for alimony payments under the settlement agreement as adopted by the divorce court should the husband die before all payments were made.

The intent of Congress in enacting the predecessor of section 71 in 1942 was "to treat such payments as income to the spouse actually receiving or actually entitled to receive them and to relieve the other spouse from the tax burden upon whatever part of the amount of such payments is under the present law includible in his gross income." S. Rept. No. 1631, 77th Cong., 2d Sess. (1942), 1942-2 C.B. 568. Clearly, the legislative intent was that the tax burden should rest on the spouse to whom the benefit accrues.

It is not required that there be an actual receipt of payments by the wife for an amount to be taxable income to her. *Melvin A. Christiansen*, *supra*; *Robert Lehman*, 17 T.C. 652 (1951). However, it is necessary that the payments by the husband confer on the wife a

presently ascertainable economic benefit for the husband to be entitled to a deduction and the wife to include in her income the amount of such payments. *Cosman* v. *United States*, 440 F. 2d 1017 (Ct. Cl. 1971); *Mandel* v. *Commissioner*, 229 F. 2d 382 (C.A. 7, 1956), affirming 23 T.C. 81 (1954); *Seligmann* v. *Commissioner, supra; Eugene F. Emmons*, 36 T.C. 728 (1961), affd. 311 F. 2d 223 (C.A. 6, 1962); *Robert Lehman, supra.*

The requisite economic benefit exists where the wife has noncontingent proprietory rights in an insurance policy and its proceeds. This economic benefit can be equated directly with whatever contractual rights, resulting from the premium payments, run in favor of the owner-beneficiary. *Katharine T. Hyde*, 36 T.C. 507 (1961), affd. 301 F. 2d 279 (C.A. 2, 1962); *Lemuel Alexander Carmichael*, 14 T.C. 1356 (1950); *Anita Quinby Stewart*, 9 T.C. 195 (1947). Cf. *Piel* v. *Commissioner*, 340 F. 2d. 887 (C.A. 2, 1965), affirming a Memorandum Opinion of this Court; *Weil* v. *Commissioner*, 240 F. 2d 584 (C.A. 2, 1957), affirming on this issue 23 T.C. 630 (1955).

To focus on the ownership and the irrevocable beneficiary of an insurance policy in determining whether the wife receives an economic benefit from premium payments by the husband will not dispose of the issue in the present case. Ownership of an insurance policy secures only those rights which the terms of the policy bestow on the owner. Similarly an irrevocable beneficiary derives his rights from the contractual rights under the policy inuring to his benefit. The insurance company which receives the premium payments from the insured does not act as a conduit for the owner-beneficiary. The premiums secure contractual rights for the benefit of the owner-beneficiary. These premium payments may or may not, depending on the terms of the contract and other circumstances, constitute taxable income to the owner-beneficiary. It is quite possible a wife may be an absolute owner and beneficiary of a policy that provides her with rights which are so limited or otherwise restricted as to have no economic substance for tax purposes. See *Harold Ostrov*, 53 T.C. 361 (1969). Consequently, to determine whether a wife receives an economic benefit which is sufficient to cause the premiums to be taxable to her, it is necessary to examine what obligations are due her under the policy, as well as whether she is the owner or assignee and irrevocable beneficiary of the policy.

We note that in the *Stevens* and *Hyde* cases the policies at issue were ordinary life policies. Under such policies the wife as owner-beneficiary received not only pure insurance protection which would decrease as the cash surrender value increased but also the right to draw down the cash value of the policy, to borrow against it, and to collat-

erally assign it. These benefits in *Stevens* and *Hyde* viewed as a whole were sufficient to constitute an economic benefit which caused the premium payments to be taxable to the wife since the taxable benefit there was measured by the amount of premiums paid.

Under the facts before us Jean was the owner and beneficiary of a term life insurance policy. She was the beneficiary of the policy under the divorce decree and insomuch as she as owner of the policy was the only person who could change the beneficiary under the terms of the policy. Her rights as beneficiary to receive the policy proceeds by virtue of William's premium payments were dependent on not only the insured's death but also this event occurring prior to 1987. We note that the fact that William was not required to pay premiums on the occurrence of Jean's remarriage was within Jean's control and therefore it is doubtful whether this contingency should be considered one which would operate to defeat Jean's rights to the policy proceeds. Under the facts here present it is not certain that Jean will ever receive the policy proceeds and the receipt of these proceeds upon William's death is the only benefit the policy carried. Therefore, under these particular circumstances, we conclude on the authority of *William H. Brodersen, Jr., supra*, that Jean did not constructively receive an economic benefit from the premiums paid during the taxable years 1968, 1969, and 1970. In reliance on *Seligmann* v. *Commissioner, supra*, we found in *Brodersen* the difference between ordinary and term life insurance policies to be highly significant. The former conferred on the owner the right to borrow on the policy and to surrender it for its cash value, while the latter conferred only a contingent right to receive the proceeds of the policy at the death of the insured during a specified time period. Such a contingent right we held in *Brodersen* did not assure the owner-wife of an "independent financial advantage" which would add directly to the wife's resources. Pure term insurance merely afforded the wife peace of mind in the knowledge that she may benefit from the policy in the future. Such peace of mind does not constitute a taxable economic gain. See *Seligmann* v. *Commissioner, supra* at 494.

In *Brodersen* we considered *Stevens* on which William relies here but we distinguished *Stevens* on its facts as there the policy was a whole life insurance policy whereas in *Brodersen* the policy was a term insurance policy. The facts of the instant case are similarly distinguishable from those in *Stevens*. Furthermore, in *Brodersen* we respectfully declined to follow the dictum in *Stevens* that "to deny constructive receipt of benefit whenever the wife's interest in the proceeds is contingent on her surviving her former spouse is to presume

that an insurance policy's only value to the beneficiary lies in receipt of the face amount upon death of the insured" as contrary to *Seligmann*. We adhere to our statement in *Brodersen* that:

We maintain our view that the protection afforded a wife through the purchase of a term-life insurance policy on her former husband's life does not qualify as an economic benefit to the wife sufficient to create taxable income. * * *

William's attempt to distinguish *Brodersen* on the grounds that there the term insurance policy was only for security purposes is not persuasive. While we were not unaware in *Brodersen* of the security aspects of the policy, our decision was based on the underlying premise that the wife did not have an indefeasible right to receive the insurance proceeds as her interest was contingent on her surviving her former husband, the insured. In other words, the wife was not certain of receiving any moneys by virtue of the policy although she was the owner and beneficiary under the policy. Therefore we concluded in *Brodersen* that the wife did not have a taxable economic benefit. See *Harold Ostrov, supra*. In *Blumenthal v. Commissioner*, 183 F. 2d 15 (C.A. 3, 1950), affirming 13 T.C. 28 (1949), and *Florence H. Griffith*, 35 T.C. 882 (1961), the decisions, even though they deal with circumstances in which the wife is not the absolute owner of the policies involved, bolster the rationale of *Brodersen* that the wife's rights as a beneficiary under a term insurance policy, being contingent on her surviving the insured, are insufficient to create taxable income to her. These authorities *supra* hold that a wife does not receive a taxable economic benefit from a husband's payments on an insurance policy which provides the beneficiary-wife collateral security for the payment of the husband's continuing obligation to support as the proceeds would become the wife's only if she outlived her former husband which was an uncertainty and the policy does not of itself presently give the divorced wife more than that which she had, the right to the support payments.

Assuming the conversion feature of the policy permitted the issuance of a whole-life policy, both policies being in the same underwriting classification, it might be argued that Jean was entitled to receive the additional benefits attributable to such a policy. However, we point out that it is unclear whether Jean was aware of the conversion feature since the original policy had been lost or destroyed. More fundamental, however, any additional benefits accruing to Jean on conversion would be at her expense as the new policy could only be issued for the same amount of insurance. Insomuch as such a new policy would require increased premium payments and William would not be obligated to pay any of this increased cost, we do not believe the conversion privilege under these circumstances actually bestowed any additional economic benefit on Jean.

William's reliance on *Melvin A. Christiansen, supra,* is misplaced. In *Christiansen* the husband paid an amount which discharged the wife's personal obligation to educate her niece and nephews. In the present case the husband paid premiums due on his wife's term insurance policy. It is the contingent nature of the wife's benefits derived under this policy which distinguish the instant case from *Christiansen* where the wife presently and immediately received the benefit accruing to her from the education of the children which the husband provided on her behalf. See *Robert Lehman, supra.* Although, since Jean took the policy out, the premiums may have been her obligation prior to the divorce, by the divorce decree they were made William's obligation and therefore Jean did not constructively receive income by William's payment of her obligation. At the time the payments were made they were William's obligation under the divorce decree and were not Jean's obligation.

Realization of taxable gain must occur in the year during which it is sought to be taxed. In *Helvering* v. *Horst,* 311 U.S. 112, 115 (1940), the Supreme Court stated: "Where the taxpayer does not receive payment of income in money or property realization may occur when the last step is taken by which he obtains the fruition of the economic gain which has already accrued to him." A term life insurance policy, unlike an ordinary life policy which has a cash surrender value and other valuable rights, has no financial value to the owner and no value to the beneficiary except the proceeds upon the death of the insured. Until this last step occurs, the insured's death, the beneficiary has no indefeasible right to the proceeds.

In conclusion, under the facts before us, Jean's rights under the policy were defeasible if she predeceased her husband and in any event by 1987. Consequently we hold she did not possess an absolute vested right to receive the policy proceeds. Under these circumstances we conclude that Jean did not constructively receive an economic benefit under the policy and no amount is includable in her income because of the payments of the premiums on this policy by William.

*Decisions will be entered under Rule 155.*