ALVIN HENRY GONINEN, JR., and JUNE E. GONINEN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Goninen v. Commissioner
Docket No. 10632-81.
United States Tax Court
T.C. Memo 1983-769; 1983 Tax Ct. Memo LEXIS 16; 47 T.C.M. (CCH) 737; T.C.M. (RIA) 83769; December 22, 1983. *16 H and W were divorced in 1975 after 31 years of marriage. Pursuant to their stipulation, the divorce decree provided for a nearly equal division of their property. As a part of such division, H agreed to pay W $84,000 over a period of 15 years. The decree also contained a separate provision for a nominal amount of alimony. Held, H has failed to prove that the provision for payment of $84,000 was included as a result of the marital relationship, rather than as a result of a property settlement. Karen A. Case, for the petitioners. James M. Klein and Linda A. Jackson, for the respondent. SIMPSON
MEMORANDUM FINDINGS OF FACT AND OPINION SIMPSON, Judge: The Commissioner determined deficiencies in the petitioners' Federal income taxes of $1,522.00 for 1977 and $1,318.00 for 1978. The sole issue for decision is whether, under section 215 of the Internal Revenue Code of 1954[1] (relating to alimony payments), the petitioners are entitled to deduct certain payments made by petitioner Alvin Goninen to his former wife, Bonnie Jean Goninen, pursuant to a divorce decree. *18 FINDINGS OF FACT Some of the facts have been stipulated, and those facts are so found. The petitioners, Alvin Henry Goninen, Jr., and June E. Goninen, husband and wife, resided in Mineral Point, Wis., at the time they filed their petition in this case. They filed their joint Federal income tax returns for 1977 and 1978 with the Internal Revenue Service. From 1944 to 1975, Alvin was married to Bonnie Jean Goninen. [2] Four children were born of such marriage. During the course of their marriage, Bonnie Jean was primarily a farm wife; she raised the children, worked in the fields during hay season, milked cows, and cooked for the family and the farm help. Bonnie Jean brought no property into the marriage, but during the course of the marriage, she inherited $1,000 from a great aunt. During the marriage, the Goninens acquired several parcels of real estate. Alvin held title to such parcels. However, over the years, Bonnie Jean signed notes and mortgages with respect to such properties on which she was personally liable. The proceeds of such notes were used to purchase other property and for general farm purposes. *19 Sometime around 1971, the Goninens' son, Michael, expressed an interest in taking over the family farming operations, and Alvin and Bonnie Jean decided to move to town. In January 1971, the Goninens purchased a residence in Mineral Point, Wis., and in December 1971, they moved there. Record title to such property was held in Alvin's name. Somtime after they moved to town, Bonnie Jean took a job at the State Historical Society, where she worked 6 months a year as a tour guide. On January 2, 1972, Alvin and Bonnie Jean executed a farm lease with their son, Michael, with respect to their home farm. The lease contained a provision giving Michael an option to purchase the farm for $96,000 and the farm machinery for $30,245. Pursuant to the lease agreement, Michael could exercise the option to purchase the farm by notifying the Goninens of his intent to do so on or before January 2, 1976. The lease also provided that any sale would be by contract payable in installments over a 15-year period. By 1975, the marriage between Alvin and Bonnie Jean had deteriorated, and she considered that the relationship was adversely affecting their 10-year-old child. Bonnie Jean hired James *20 Harris, an attorney, and in March 1975, she instituted divorce proceedings against Alvin. Alvin retained Roger Mueller as his attorney. Mr. Mueller initiated the negotiations with Mr. Harris. To facilitate a settlement, Mr. Mueller prepared a schedule of assets and liabilities which showed that the Goninens' net worth was $285,730. By letter dated September 10, 1975, Mr. Mueller pointed out to Alvin that "Since your marriage is of long duration it is my opinion that a court would award her property division of close to 50 percent." Therefore, he proposed a division of property giving 47 percent to Bonnie Jean and 53 percent to Alvin. In the course of the negotiations, various proposals were made in an attempt to effectuate an equal division of the property. Under the first proposal, Bonnie Jean was to receive a one-half interest in one of the farms. However, Mr. Mueller discovered that an outright transfer of such interest to her might result in Alvin having to pay a substantial capital gain tax. In addition, Alvin let it be known that he was not willing to relinquish his interests in certain farms. Moreover, the Goninens intended to sell the home farm to their son pursuant *21 to the option granted to him. With these considerations in mind, Mr. Mueller proposed that the home farm be sold to Michael on an installment basis. In accordance with Alvin's wishes, Mr. Mueller also arranged with Mr. Harris for Alvin to retain interests in the real property. Eventually, the parties executed a stipulation providing for the division of their properties. As a part of such division, Bonnie Jean agreed to accept $84,000 in cash: $60,000 of such amount was to be paid in 15 annual installments of $4,000, and $24,000 was to be paid by way of 12 annual installments of $2,000. The $4,000 annual installments were secured by the home farm, which was to be sold to Michael under an installment contract. The $2,000 annual installment payments were secured by the Graber property, which was to be sold under a 12-year installment contract. The stipulation between the parties provided that the annual payment of $4,000 to Bonnie Jean was contingent on Alvin receiving the $4,000 annual payment from the sale of the home farm. Bonnie Jean would have liked to have received the $84,000 cash settlement outright. However, due to Alvin's claim that he lacked the cash to make such a payment, *22 his insistence on retaining interests in the farms, and the parties' desire to have their son purchase the home farm, she agreed to accept the cash payments over time. During the course of the negotiations, "heated discussions" occurred over the question of alimony. Mr. Harris was originally led to believe that Alvin would not stipulate to a provision for the payment of alimony. Yet, in a letter to Mr. Mueller, Mr. Harris wrote: I would also request that a nominal of alimony be agreed to because of Mrs. Goninen's age and employability. At some future date she may have cause to request maintenance for herself. The amount of $5.00 per month alimony would be acceptable. Mr. Mueller wrote to Mr. Harris and stated that he considered the payments to be made by Alvin to be "a form of alimony." The parties eventually included a provision in the stipulation whereby Bonnie Jean was to "receive the sum of $5 per year * * *, said amount to constitute an alimony payment." At the time of the divorce, Alvin earned approximately $500 to $550 per month, and Bonnie Jean earned approximately $300 per month during the months that she worked. On December 22, 1975, Alvin and Bonnie Jean were *23 divorced. The stipulation of the parties, with minor exception, was incorporated into the divorce decree. The court awarded custody of the minor child to Bonnie Jean and allowed her to claim the child as a dependent for Federal income tax purposes. Alvin was ordered to pay $100 per month as child support. The decree provided, in part: That the plaintiff [Bonnie Jean] shall be awarded
cash in the amount of $84,000 payable as follows: (i) The sum or $60,000 shall be payable in 15
annual installments of $4,000 each, the first payment
to be made within ten (10) days of January 1, 1976.
That the * * * [home farm] shall stand as security for
these payments and the plaintiff shall have a lien
thereon to enforce the provisions of this subparagraph.
That upon final payment such lien shall cease.
60,000.00
Provided, that in the event the purchaser of the * * * [home farm] fails to make annual land contract
payment when due, defendant [Alvin] shall not be in
default under this provision so long as he makes payment
to the plaintiff within twenty (20) days of receipt
of payment from land contract purchaser, but
in no event shall payment be delayed more than 90 days.
(ii) The sum of $24,000 shall be paid in 12 annual
installments in the amount of $2,000, the first installment
due March 1, 1976 and subsequent annual installments
due on March 1st of each year. The judgment in this action
shall provide that the Graber farm * * * shall
stand as security for these payments and the plaintiff
shall have a lien thereon to enforce payments of the
provisions of this subparagraph. That upon final payment
such lien shall cease. --
24,000.00
*24 At another point, the decree provided: That the annual payment of $4,000 for 15 years and $2,000 for 12 years shall be binding upon * * * [Alvin], his heirs and assigns, that * * * [Bonnie Jean], for herself, her heirs and assigns shall release the lien provided as security for payment upon receipt of the final of said annual installments. [Emphasis added.] The decree contained a separate provision for an alimony payment, which provided: * * * [Bonnie Jean] shall receive the sum of $5 per year payable on or before January 10th of each year, first payment due on or before January 10, 1976, said amount to constitute an alimony payment or additional alimony payment * * * [Emphasis added.] Mr. Mueller prepared the decree of divorce and added the words "or additional alimony payment" to the decree. The following schedule reflects the division of the marital property pursuant to the divorce decree, the record owner of such property before the division, and other payments which were made to effect the division of the property: Item
Prior Owner
Value
To Bonnie Jean
Personal residence
Alvin
$ 45,500.00
Household furnishings and
Joint or Bonnie
7,150.00
personal belongings
1970 Pontiac
Unknown
1,500.00
Strong's Bank savings account
Joint
2,428.51
Series E savings bonds
Joint
200.00
One-half of $1,000 certificate
of deposit issued 9/22/73
Joint
500.00
Life insurance policies
Bonnie & Alvin
3,740.00
Cash
84,000.00
Attorney's fees
500.00
Total
$145,518.51
To Alvin
Household furnishings and personal
Joint or Alvin
$ 4,450.00
belongings
1969 Chevrolet
Unknown
900.00
Series E savings bonds
Joint
200.00
One-half of $1,000 certificate
of deposit issued 9/22/73
Joint
500.00
Life insurance policies
Alvin
2,925.00
Kirk farm
Alvin
42,800.00
Travel trailer
Joint
2,000.00
Home farm (net value) [3]
Alvin
36,000.00
Graber farm (net value) [3]
Alvin
92,000.00
Farm machinery and livestock
Alvin
16,500.00
Vested retirement benefits
Alvin
446.00
Notes receivable
Alvin
57,358.52
Total
$256,079.52
Less: assumed liabilities
109,287.17
Balance
$146,792.35
*25 Pursuant to the judgment of the divorce court, neither party could remarry for 6 months. In June 1976, Alvin applied for a marriage license. On their Federal income tax returns for 1977 and 1978, the petitioners deducted $6,005 each year as alimony payments to Bonnie Jean. However, Bonnie Jean included in income only $5 a year as alimony. In his notice of deficiency, the Commissioner determined that $6,000 of the payments made by Alvin each year did not constitute alimony and therefore were not deductible. OPINION The sole issue for decision is whether certain installment payments made by Alvin to Bonnie Jean pursuant to a divorce decree were deductible under section 215. The resolution of this issue turns upon whether such payments were periodic payments made in discharge of a legal obligation incurred by Alvin because of the marital or family relationship. Section 215(a) provides, in part: In the case of a husband described in section 71, there shall be allowed as a deduction amounts includable under section 71 in the gross income of *26 his wife, payment of which is made within the husband's taxable year. * * * Section 71(a)(1) provides, in part: If a wife is divorced * * * from her husband under a decree of divorce * * *, the wife's gross income includes periodic payments * * * received after such decree in discharge of * * * a legal obligation which, because of the marital or family relationship, is imposed on or incurred by the husband under the decree or under a written instrument incident to such divorce * * *. See also secs. 1.71-1(b)(1), 1.215-1(a), Income Tax Regs. Section 71(c) deals with a principal sum paid an installments and provides, in part: (c) Principal Sum Paid in Installments-- (1) General rule.--For purposes of subsection (a), installment payments discharging a part of an obligation the principal sum of which is * * * specified in the decree * * * shall not be treated as periodic payments. (2) Where period for payment is more than 10 years.--If, by the terms of the decree, * * * the principal sum referred to in paragraph (1) is to be paid * * * over a period ending more than 10 years from the date of such decree, * * * then (notwithstanding paragraph (1)) the installment payments *27 shall be treated as periodic payments for purposes of subsection (a) * * * Section 71(a) applies only to payments made because of the family or marital relationship in recognition of the general obligation to support which is made specific by the decree. Sec. 1.71-1(b)(4), Income Tax Regs. However, it is well settled that where, upon divorce, a husband makes payments in satisfaction of the property rights of his wife, the amounts received by the wife, even though periodic and incident to a divorce, are capital in nature and therefore are not includable in her gross income under section 71; nor are they deductible by her former husband under section 215. See, e.g., McCombs v. Commissioner,397 F.2d 4 (10th Cir. 1968), affg. a Memorandum Opinion of this Court; Beard v. Commissioner,77 T.C. 1275 (1981); Pierce v. Commissioner,66 T.C. 840 (1976); Wright v. Commissioner,62 T.C. 377 (1974), affd. 543 F.2d 593 (7th Cir. 1976); Mills v. Commissioner,54 T.C. 608 (1970), affd. 442 F.2d 1149 (10th Cir. 1971). In determining whether the payments constituted alimony or whether *28 they were part of a property settlement, we must ascertain the intention of the parties. Phinney v. Mauk,411 F.2d 1196, 1198 (5th Cir. 1969); Beard v. Commissioner,77 T.C. at 1283-1284. Such a determination involves a question of fact; we are not bound by the labels of the parties nor by those that a court may have placed upon the payments. Hesse v. Commissioner,60 T.C. 685 (1973), affd. without published opinion 511 F.2d 1393 (3d Cir. 1975); Ryker v. Commissioner,33 T.C. 924, 929 (1960). To determine the intent of the parties, the courts have looked to such factors as the negotiations between the spouses, whether a fixed sum is stated, whether the payments are related to the income of either spouse, whether the payments are to continue without regard to the remarriage or death of the wife, whether the wife relinquished property rights in exchange for the payments, whether the decree specified support payments, in addition to other payments, and whether the husband's obligation to make the payments is secured. See McCombs v. Commissioner,supra;Porter v. Commissioner,388 F.2d 670 (6th Cir. 1968), *29 affg. per curiam a Memorandum Opinion of this Court; ( Bernatschke v. United States,176 Ct. Cl. 1234, 364 F.2d 400 (1966); Beard v. Commissioner,77 T.C. at 1284-1285; Weiner v. Commissioner,61 T.C. 155 (1973); Mirsky v. Commissioner,56 T.C. 664 (1971); Watkins v. Commissioner,53 T.C. 349 (1969); Thompson v. Commissioner,50 T.C. 522 (1968); Ryker v. Commissioner,33 T.C. at 929-930. The petitioners argue that the payments were structured as alimony and were designed to be paid over a period of more than 10 years in order to be deductible. They maintain that the payments were made in discharge of a legal obligation growing out of the marital relationship, were purely for the support of Bonnie Jean, and were not made in exchange for any of her property rights. Accordingly, they conclude that the payments should be deductible by them as alimony under section 215. On the other hand, the Commissioner argues that the disputed payments constituted part of a property settlement. He maintains that throughout their negotiations, the spouses intended to effect an equal *30 division of the property and that the cash payments were merely a means of effectuating such intent. He asserts that Bonnie Jean was given $84,000 in cash to provide her with roughly one-half of the total property of the Goninens, that she was given cash because Alvin wished to retain interests in the farms, and that the cash award was paid in installments because Alvin lacked the cash to pay the obligation in a lump sum. The petitioners bear the burden of proving that the payments in question are deductible. Rule 142(a), Tax Court Rules of Practice and Procedure; Welch v. Helvering,290 U.S. 111 (1933). The petitioners vigorously argue that the payments to Bonnie Jean were not part of a property settlement because she had no rights to the property owned by Alvin to exchange for the payments. We disagree. In Beard v. Commissioner,supra, a similar argument was advanced, and we held that pre-existing legal or "actual" ownership rights need not be present in order for payments to be considered part of a property settlement.[4] In Beard, the spouses had been married approximately 28 years. 77 T.C. at 1287. Record title *31 to property worth $88,000 was held by the wife, $69,600 was held by the husband, and $145,900 was held in some form of joint ownership. In addition, the husband had purchased a business, which at the time of the divorce, was valued at $592,000. The Michigan divorce court awarded $80,000 of property to the wife and $780,500 to the husband. 77 T.C. at 1280. The court also ordered the husband to make a lump-sum payment of $40,250 and to pay $310,000 in installments over a period of 121 months. 77 T.C. at 1277-1278, 1280. In Beard, we considered that the court was empowered, under Michigan law, to apportion the marital property in a just and reasonable fashion, irrespective of legal ownership, based on factors not necessarily related to the needs of the wife, such as the duration of the marriage and the relative contributions of the parties; thus, we concluded that the disputed cash payments were in the nature of a property settlement. 77 T.C. at 1287, 1290. In reaching this conclusion, we specifically determined that the wife had acquired an interest in her *32 husband's separately titled property by virtue of her monetary and nonmonetary contributions during their marriage which was recognized by the court upon the divorce. 77 T.C. at 1290 n. 9. We directly rejected the argument by the husband that a portion of the disputed cash payments was necessarily in the nature of support since his wife did not surrender "tangible" property rights in exchange for the payments. We said: the payments need only be in the nature of a division of capital * * *, and the extent to which preexisting ownership rights in the marital property were surrendered as a quid pro quo is merely one factor to consider in resolving the issue. The trial court was legally required to divide property acquired in the course of the marriage in a fair and equitable manner, taking into account all relevant facts and circumstances. It chose to treat the marriage as a partnership and divided the marital property almost exactly in half, using the lump-sum and installment payments to balance the division. [5] * * * [77 T.C. at 1290; emphasis in original; footnote omitted.] *33 We believe that a similar analysis is warranted in the present case. As in Michigan, the division of property and adjustment of property rights upon divorce in Wisconsin depends upon the facts and circumstances of the particular case, and it is the responsibility of the court to fairly, equitably, and justly divide the marital property between the spouses. Bussewitz v. Bussewitz,75 Wis. 2d 78, 248 N.W. 2d 417 (1977); Lacey v. Lacey,45 Wis. 2d 378, 173 N.W. 2d 142 (1970), as modified after remand 61 Wis. 2d 604, 213 N.W. 2d 80 (1973). Under Wisconsin law, a divorce court has the power to provide for both alimony and a final division of property. Morris v. Morris,13 Wis. 2d 92, 108 N.W. 2d 124 (1961); Brackob v. Brackob,262 Wis. 202, 54 N.W. 2d 900 (1952), modified and affirmed after remand 265 Wis. 513, 61 N.W. 2d 849 (1953). Alimony and support money are, as a general rule, fixed upon the needs of the wife and children and on the ability of the husband to pay. Balaam v. Balaam,52 Wis. 2d 20, 187 N.W. 2d 867 (1971). The needs of the wife are ordinarily determined *34 by her assets and income, her earning capacity, her age and health, and her special needs. The ability of the husband to pay is usually determined by his income, assets and debts, and his age and health. Balaam v. Balaam,187 N.W. 2d at 870; Hirth v. Hirth,48 Wis. 2d 491, 180 N.W. 2d 601 (1970). On the other hand, a division of estate is an adjustment of the property rights and equities between the parties and is readily distinguishable in its use and purposes from alimony and support for dependent children. Brackob v. Brackob,supra.In the landmark case of Lacey v. Lacey,supra, the Wisconsin Supreme Court set forth a variety of appropriate factors for consideration in making a property division. The court said: "Whatever is material and relevant in establishing a fair and equitable basis for division of the property of the parties may be considered." 173 N.W. 2d at 145. The factors enunciated in Lacey were subsequently codified in section 247.26, Wisconsin Code Annotated (1975), which provided that all the circumstances of the case should be given due regard. The Lacey court *35 also considered a marriage to be in the nature of a partnership and wrote: The division of the property of the divorced parties rests upon the concept of marriage as a shared enterprise or joint undertaking. It is literally a partnership, although a partnership in which contributions and equities of the partners may and do differ from individual case to individual case. * * * In a long marriage, particularly as to property acquired by the parties during the marriage, a fifty-fifty division may well represent the mutuality of the enterprise. In determining the proportion of contributions by husband and by wife in the acquisition of property, more than economic factors are involved. We do not deal with two people with no more in common than two strangers or business associates. The contribution of a full-time homemaker-housewife to the marriage may well be greater or at least as great as those of the wife required by circumstances or electing by preference to seek and secure outside employment. The formula for division derives from the facts of the individual case. * * * [173 N.W.2d at 144-145.] See also Wilberscheid v. Wilberscheid,77 Wis. 2d 40, 252 N.W. 2d 76, 80 (1977); *36 Kunde v. Kunde,52 Wis. 2d 559, 191 N.W. 2d 41 (1971); cf. K. Case, "Divorce: The Anti-Davis Trend Property Settlement," 52 Wis. Bar Bulletin 6, 9 (Oct. 1979). At the time of the divorce in this case, the Goninen marriage had existed for many years, and Bonnie Jean played an integral role in building the marital estate through her efforts in maintaining the home and assisting in the operations of the farm. In addition, although record title to the real property was held by Alvin, Bonnie Jean signed notes and mortgages on which she was personally liable. The proceeds of such notes were used for farm purposes and to acquire additional real property. The fact that Alvin held legal title to the properties has little bearing on the division of property where the marriage was viewed by the divorce court as a partnership in which both parties contributed their respective abilities to the acquisition and preservation of marital assets. Lacey v. Lacey,supra. The court was empowered to divide the property on an equitable basis ( Morris v. Morris,supra;Hartman v. Hartman,253 Wis. 389, 34 N.W. 2d 137, 139 (1948); *37 see also Lacey v. Lacey,supra); and under the circumstances of this case, the court could give weight to the fact that the properties possessed by the parties resulted from their joint efforts (see, e.g., Manske v. Manske,6 Wis. 2d 605, 95 N.W. 2d 401, 403 (1959); Bruhn v. Bruhn,197 Wis. 358, 222 N.W. 242 (1928)). Since the parties estimated that Bonnie Jean's award could amount to 50 percent of the property, they attempted to stipulate to an equal division of the property. In fact, throughout the negotiations, the intent to divide the property equally never changed; only the manner for its distribution varied. Various proposals were offered and rejected, based primarily on Alvin's insistence that he retain interests in the real estate which otherwise could have been sold or transferred to Bonnie Jean. Although Bonnie Jean would have liked to have completed the division of property at the time of the divorce, she also wanted her son to have an opportunity to purchase the home farm. Thus, to facilitate both an equal and amicable division of the property, she agreed to accept $84,000 in cash payable in installments over a number *38 of years. At the same time, Alvin was adamant in his unwillingness to pay Bonnie Jean any alimony. Initially, Mr. Harris proposed that a provision be inserted in the stipulation including $5 a month for alimony. Such a nominal amount was proposed to protect Bonnie Jean, since under Wisconsin law, a judgment providing only for a final division of property could not thereafter be modified to include a provision for alimony. See, e.g., Schall v. Schall,259 Wis. 412, 49 N.W. 2d 429 (1951); Gray v. Gray,240 Wis. 285, 3 N.W. 2d 376 (1942). After heated negotiations, the parties eventually stipulated to an alimony payment of $5 per year. Under these circumstances, we conclude that both parties had a full and fair opportunity to discuss the alimony provision at the time of the divorce negotiations. Therefore, we conclude that the amount provided as alimony properly reflected the intent of the parties, and that the cash award of $84,000 was in the nature of a property settlement. Beard v. Commissioner,77 T.C. at 1290; see Riley v. Commissioner,649 F.2d 768 (10th Cir. 1981), affg. a Memorandum Opinion of this Court; *39 Mann v. Commissioner,74 T.C. 1249 (1980). [6]
Other factors indicative of a property settlement are present in this case. First, the amount of the payments was fixed and was not geared to Alvin's income or Bonnie Jean's needs. See Ryker v. Commissioner,33 T.C. at 929; Brown v. United States,121 F. Supp. 106, 107 (N.D. Cal. 1954). In addition, the payments were assignable by Bonnie Jean, were not contingent on the death or remarriage of either party, and were linked to Alvin's receipt of payments on the contract for the sale of the farm, which he retained pursuant to the parties' stipulation. When we consider all these facts, they inescapably lead us to the conclusion that the provision for the payment of $84,000 was intended by the parties to be part of an overall property settlement, rather than for the support of Bonnie Jean. Widmer v. Commissioner,75 T.C. 405, 409 (1980). The petitioners relied on Wright v. Commissioner,supra, for support, but that case *40 is distinguishable. In Wright, the parties expressly did not include any provision for alimony in their stipulation (62 T.C. at 381), and the question arose whether certain installment payments constituted support or were part of a property settlement. The Tax Court found that the parties had referred to their agreement as "a property settlement * * * in 'lieu of alimony'" (62 T.C. at 392) and held that the payments were in the nature of support since they were made in discharge of a legal obligation imposed because of the marital relationship (62 T.C. at 390). In reaching this conclusion, we found that the installment payments were not awarded to the wife in exchange for property owned by her at the time of the divorce, since she received all of her separate property in addition to the lump-sum award. 62 T.C. at 390. Also, there was no other evidence indicating that the payments were a part of a plan designed to divide the properties of the spouses. Unlike the situation in Wright, the parties in this case never contemplated a division of property based strictly along ownership lines. [7] In addition, the parties expressly *41 stipulated to a separate provision for alimony and never referred to the $84,000 in cash as being "in lieu of alimony." Under Wisconsin law, a formal stipulation in a divorce action is treated as being in the nature of a contract. Schmidt v. Schmidt,40 Wis. 2d 649, 162 N.W. 2d 618 (1968); Miner v. Miner,10 Wis. 2d 438, 103 N.W. 2d 4 (1960). The evidence shows that the parties were aware that a court could divide the marital property without regard to title, that a court could award Bonnie Jean half of the property, and that Alvin sought to retain much of the real property, and from such evidence, it is clear that the Goninens intended a division of properties and that the provision for the $84,000 in cash was to furnish Bonnie Jean with her fair share of the property. Furthermore, considering the fact that Alvin applied to remarry as soon as his divorce became final, it is also easy to see why he stipulated to a division of the property rather than face a protracted court battle. Cf. Schottenstein v. Commissioner,75 T.C. 451, 462 n. 9 (1980) and *42 cases cited therein. The fact that the disputed payments were structured to be paid over 15 years does not make them deductible under section 215 where they were not paid in discharge of a legal obligation arising out of the marital or family relationship. Sec. 1.71-1(b)(4), Income Tax Regs.; Lambros v. Commissioner,459 F.2d 69 (6th Cir. 1972), affg. a Memorandum Opinion of this Court; cf. Van Orman v. Commissioner,418 F.2d 170, 172 (7th Cir. 1969), affg. a Memorandum Opinion of this Court. Moreover, the payments may have been spread over such a period of years because Alvin lacked the cash to make the payments earlier. Under the circumstances of this case, the disputed payments constituted part of a property settlement and are therefore not deductible by the petitioners. [8]
*43 Decision will be entered for the respondent.
Footnotes
1. All statutory references are to the Internal Revenue Code of 1954 as in effect during the years in issue, unless otherwise indicated.↩
2. To avoid confusion, we shall refer to them by their first names, Alvin and Bonnie Jean.↩
3. The net values represent the balances payable for the properties after the subtraction of the amounts payable to Bonnie Jean.↩
4. See also Hall v. Commissioner,T.C. Memo. 1982-605↩.
5. The court refused to label the interest acquired by the wife in the husband's property, stating that: we see no purpose to be served in attempting to classify the interest as legal or equitable, tangible or intangible, vested or nonvested, or choate or inchoate; the fact of the matter is that the interest existed, it was recognized by the court upon divorce, and it did not derive from the husband's legal support obligation. That, in our judgment, is sufficient to support a holding that the payments attributable to that interest were in the nature of a property settlement. * * * [77 T.C. at 1291↩ n. 9.]
6. See also Boucher v. Commissioner,T.C. Memo. 1981-258, affd. 710 F.2d 507↩ (9th Cir. 1983).
7. Compare Graham v. Commissioner,T.C. Memo. 1981-692↩.
8. On brief, the petitioners relied on our decision in Wright and argued that the relinquishment of inchoate rights could not support a division of property. See 62 T.C. at 391. The Seventh Circuit affirmed our decision in Wright (543 F.2d 593 (1976)). However, it held that the surrender of inchoate rights could, in some circumstances, support a division of property. 543 F.2d at 598. Since our decision in this case is not based upon the relinquishment of inchoate rights, we need not decide, under the circumstances of this case, whether the relinquishment of any inchoate rights could support a division of property. See Lewis v. Commissioner,T.C. Memo. 1983-770↩, filed this day.